IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD GIULIANI, SR. and | : | |
| RICHARD GIULIANI, JR. | : | |
| | : | CIVIL ACTION |
| v. | : | NO.  10-7518 |
| SPRINGFIELD TOWNSHIP, et al. | : | |

O'NEILL, J.                                                    February 27, 2017

## MEMORANDUM

The case before me involves a longstanding and ongoing dispute concerning the use of a 5.29-acre property located at 50 Oreland Mill Road in Springfield Township, Pennsylvania.  The owners of the property, plaintiffs Richard Giuliani, Sr. and Richard Giuliani, Jr., bring this federal suit against defendants Springfield Township, Springfield Township Board of Commissioners, Springfield Township Zoning Hearing Board, Commissioner Glen A. Schaum, Commissioner Jeffrey T. Harbison, Commissioner Baird M. Standish, Commissioner Robert E. Gillies, Jr., Commissioner Alison McGrath Peirce, Commissioner James E. Dailey, Commissioner Douglas J. Heller,[1] Township Manager Donald Berger, Zoning Officer Robert Dunlop, Code Enforcement Officer and Fire Marshal Charles H. Baily, Code Enforcement Officer and Fire Marshal Richard Lesniak and the Township's Consulting engineer Amy Riddle Montgomery, P.E.  The complaint seeks relief under 42 U.S.C. § 1983 for violations of plaintiffs' procedural due process rights, substantive due process rights and equal protection rights.  In addition, plaintiffs allege a conspiracy pursuant to 42 U.S.C. § 1985(3), as well as a state law claim for tortious interference with actual and prospective relations.  After extensive

---

[1]        Commissioner Douglas J. Heller has passed away since the inception of this case.

discovery, defendants now move for summary judgment on all claims.  For the following

reasons, I will grant the motion and enter judgment in favor of all defendants in this case.

## FACTUAL HISTORY

### I.      History of the Property

Plaintiffs originally purchased the property at 50 Oreland Mill Road in Springfield

Township, Pennsylvania on September 12, 1996, from Penn Valley Plywood.  Pls.' Opp'n

Summ. J., Ex. B, at No. 6; Pl's Opp'n Summ. J., Ex. C, at No. 6.  The property is a 5.29-acre

tract, predominantly zoned for industrial use with three principal structures:  a two-story, 5,400

square foot office building, a 32,800 square foot warehouse and a 4,000 square foot Quonset hut.

Defs.' Mot. Summ. J., Ex. 4, Dep. of Richard Giuliani, Jr. (Giuliani Jr. Dep.), 63:7–66:6

(approximating sizes).  While the property was owned by Penn Valley Plywood, a portion of it

was used for Penn Valley's own manufacturing business, and other portions were leased to

multiple tenants including Edge Transportation, David Kale t/a Kale Design, Robert Forrester,

Felwick Fire Association and Glenn Schaum.  Giuliani Jr. Dep. 63–80; Pls.' Opp'n Summ. J.,

Ex. E.

When plaintiffs obtained ownership of the property on September 12, 1996, they

continued the leases of those existing tenants and leased back a portion of the property to Penn

Valley Plywood, Inc.  Giuliani Jr. Dep. 88:6–89:13.  According to plaintiff Richard Giuliani, Jr.,

prior to entering the agreement of sale, he spoke with the building inspector and code enforcer at

the Springfield Township municipal office, Richard Lesniak to ask if there was anything he

should know about the property, and Lesniak said no.[2]  Id. at 21:7–21.  Township Manager

Donald Berger testified that, in 1996, the Township was not aware of the presence of tenants at

---

[2]      Defendants contend, however, that Lesniak did not begin working for the Township until
1998, after plaintiffs' purchase of the property.

the property.  Defs.' Mot. Summ. J, Ex. 5, Dep. of Donald Berger (Berger Dep.), 686:2–687:3.

He further explained that, to his knowledge, Penn Valley Plywood had never applied for land

development approval or for use and occupancy permits for any of the tenants that were there on

September 12, 1996.  Id. at 687:4–14.

## II.      Tenants on the Property After Plaintiffs Acquired It

Plaintiffs retained M.M. Collins to provide property management services for the

property.  In that capacity, M.M. Collins sent several communications to Glenn Schaum, who

was the secretary/treasurer of the Fellwick Fire Association, regarding Fellwick's and Schaum's

delinquent rent from late 1996 into 1997.  Pls.' Opp'n Summ. J. Summ. J., Ex. I, Dep. of Glen

Schaum (Schaum Dep.) 22:19–23:20; Pls.' Opp'n Summ. J., Exs. J, K, L and M.  Ultimately,

plaintiffs, through M.M. Collins, gave notice of their intention to institute eviction proceedings

against Fellwick Fire Association and Schaum, but never carried out the eviction because

Fellwick Fire Association vacated the property voluntarily without paying the back rent.  Defs.'

Mot. Summ. J., Ex. 13, Dep. of Richard Giuliani, Sr. (Giuliani, Sr. Dep.) 54:1–18.  Schaum was

subsequently elected to the Springfield Township Board of Commissioners in 1997, and served

as its Vice President from 2000 to 2003, and as its President from 2004 to 2005.  Schaum Dep.

39–45.

Plaintiffs then either terminated the leases of the five "transition" tenants or the tenants

left the property on their own.  Thereafter, plaintiffs leased portions of the property to additional

tenants who occupied the property at various points in time from 1998 to the present.  They

include:  Elite Limo (lease date 5/30/98); McNamara Masonry Restoration (oral lease in 1997;

returned in 2010); James A Grundy Agency, Inc. (lease date 5/13/98); Belcher Roofing

Corporation (lease date 1998); Iggy's Landscaping (oral lease); RMG General Contractors (oral

lease); E-Pak Technologies (lease date 9/1/01 to 2003); Leary Trucking and Paving, Inc. (lease date 1/15/02, vacated then returned; presently a tenant); PennMark Auto (lease date 4/15/03 to 2008); Alan A. Myers, Inc. (lease date 1/28/04 to 2006); First Student (lease date 7/1/09 to 9/1/13); Cheltenham Transportation (lease date 9/13 to present); and Green Lighting and Paper (lease date 6/10/10 to 12/13).  Giuliani Jr. Dep. 108–124, 138–204.

### III.   Plaintiffs' Early Land Use Applications to the Township

On July 13, 2000, plaintiffs submitted a formal subdivision application for the property, proposing a four-lot subdivision.  Pl.'s Opp'n Summ. J., Ex. N.  The proposal called for one lot at the front which would keep the existing office building, a second lot behind it where the warehouse was located and one or two residential lots on Lynn Avenue.  Id.  The prospective purchaser of the second warehouse lot was the New Life Presbyterian Church.  At some point, however, the church pulled out of the negotiation, and plaintiffs opted not to subdivide.  Giuliani, Jr. Dep. 328:7–23.

In mid-2001, plaintiffs sought to rent a portion of the property to Romano's School Bus Service for storage and parking of school buses.  According to the lease between plaintiffs and Romano's, plaintiffs were required to do some relatively small paving.  On July 6, 2001, plaintiffs' consulting engineer, Anthony John Hibbein, P.E., sent a letter to Code Enforcement Officer/Fire Marshal Richard Lesniak advising that plaintiffs proposed to pave 9,500 square feet of the property.  Defs.' Mot. Summ. J., Ex. 11.  The letter stated, "[p]lease review the enclosed schematic and let me know how the township would like to procedurally handle this matter."  Id. Lesniak raised the matter before the Township staff meeting and, in a letter dated July 13, 2011, explained that it was "the consensus of the staff members that a full land development plan should be prepared for the subject property."  Defs.' Mot. Summ. J., Ex. 12.  On August 6, 2001,

4

Richard Collier, plaintiffs' consulting land planner, wrote to Lesniak stating that plaintiffs no longer wished to lease the property for bus operations and, therefore, were not going to pursue the prior application for subdivision any further.  Defs.' Mot. Summ. J., Ex. 10.  In that same letter, Collier said that plaintiffs intended to lease the two existing buildings to a new tenant who would use them as an office and warehouse.  Id.

## IV.     Defendants' Alleged Harassment and Citation of Plaintiffs

According to plaintiffs, shortly after their purchase of the property, Township vehicles began to show up on the property constantly.  Giuliani Jr. Dep. 539:2–21.  Giuliani Jr. recalled that when plaintiffs engaged in initial efforts to clean up the property, Detective William Householder and other Township officials came to the property just to inspect their efforts.  Id. at 539:14–540:4.  Plaintiffs later learned that Detective Householder lived on the street immediately behind the property and, in May 1998, was elected as the District Justice for District No. 38-1-08 in Montgomery County, a district that included the property.  Defs.' Mot. Summ. J., Ex. B ¶ 57 & Ex. C ¶ 57.

In January 2001, Lesniak sent a letter to Giuliani Jr. confirming that during a recent telephone conversation, plaintiffs were informed that they would have to remove trailers stored at the property.  Pl.'s Opp'n Summ. J., Ex. P.   At a routine inspection in the area on January 24, 2001, however, Township officials noted that the trailers had not been removed and plaintiffs were in violation of Section 114-137C of the Springfield Township Code.  Id.  Accordingly, Lesniak instructed plaintiffs to remove the trailers within fifteen days.  Id.  Plaintiffs contended that the storage of the trailers was permitted by the Code because they were used by their own company in the ordinary course of business operations.  Pl.'s Mem. Supp. Opp'n Summ. J. 8.

In October 2001, plaintiffs received a citation for allegedly failing to obtain building permits for maintenance and repair work.  Defs.' Mot. Summ. J., Ex. 1.  Plaintiffs paid the fine without contest in court and filed an application for building permits in May 2001.  Pls.' Opp'n Summ. J., Ex. Q.

On December 13, 2001, one of plaintiffs' then-tenants, E-Pak technologies, received a letter from the Township regarding an anonymous complaint about "illegal rubbish" stored on the property.  Pls.' Opp'n Summ. J., Ex. T.  The letter stated that "the Township will not collect these items.  You are responsible to have them removed by a private contractor.  Please have this situation corrected within 5 (five) days of receipt of this letter otherwise further enforcement action may be taken."  Id.

## V.      Dispute Over Plaintiffs' Failure to Submit a Land Development Plan

On November 19, 2001, Code Enforcement Officer Lesniak received a memorandum from Township Manager Donald Berger advising he had been informed, and later observed, that the property was being used by two commercial enterprises.  Defs.' Mot. Summ. J., Ex. 19.  As a result, on December 5, 2001, Lesniak sent a letter to Giuliani Jr. stating that plaintiffs were required to submit a formal land development plan because of multiple leaseholds on the property.  Defs.' Mot. Summ. J., Ex. 6.  The letter explained that the Township was "in receipt of complaints regarding an increased amount of business activity at the above referenced property." Id.  Mr. Lesniak also remarked, during his inspection, that the office building was occupied by a tenant and at least two businesses occupied the warehouse.  Id.  Defendants assert that, until that

time, the Township defendants, with perhaps the exception of Glenn Schaum,[3] were unaware

that plaintiffs had multiple tenants on their property.

In January 2002, Lesniak requested Berger give him an update as to the status of the

"Giuliani development on Oreland Mill Road."  Defs.' Mot. Summ. J., Ex. 19.  Berger

responded, on February 4, 2002, that "Rick Collier is in the process of preparing plans for the

subject property.  I spoke with Rick on Friday 2/1/2 and he will be sending a letter confirming he

is working on the plan."  Id.  The next day, Collier sent Lesniak the promised letter noting he

was working on a plan for the property that included use of the office and warehouse space.

Defs.' Mot. Summ. J., Ex. 20.  Collier stated there were three tenants on the property at the time

including:  E-Pak, a company that assembles and installs mechanical systems; a roofing

contractor that was using the warehouse for storage of roofing materials; and a landscape and

lawn maintenance company that was temporarily parking two to three trucks on the property

during non-business times and occasionally cutting and splitting firewood on site.  Id.

On March 8, 2002, the Township issued a citation to plaintiffs for failure to submit a land

development plan prior to allocating space among occupants for the purpose of creating a

leasehold.  Defs.' Mot. Summ. J., Ex. 14.  Plaintiffs paid the resulting fine.  Giuliani Sr. Dep.

126–29.

Approximately six months later, on July 31, 2002, Collier submitted a sketch plan for the

property.  Defs.' Mot. Summ. J., Ex. 21.  He explained that plaintiffs' goal was to create a flex-

office complex that retained the existing brick office building and the large warehouse occupied

by EPAC, and to add some new structures for flex-office.  Id.  Additionally, plaintiffs intended to

---

[3]     Schaum testified that when he was a tenant, he had no idea what kinds of permits had
been issued for the property.  Schaum Dep. 176:11–23.  Nor did he have knowledge that the
property had even been transferred to plaintiffs at the time.  Id.

address related needs including vehicular access, stormwater management and parking.  Id.
Collier requested the opportunity to appear before the Planning Commission for informal
discussion in early September.  Id.  There is no further evidence regarding the sketch plan.

Notwithstanding the Township's repeated instructions that plaintiffs needed land
development approval for their intended use of the property, plaintiffs did not submit a land
development application throughout the remainder of 2002 or well into 2003.  During that time,
plaintiffs continued to lease portions of the property to new tenants without applying for use and
occupancy permits.  For example, in April 2003, plaintiffs leased half of the warehouse to
PennMark Auto for the detailing of Mercedes Benz automobiles.  Defs.' Mot. Summ. J., Ex. 23.
In addition, beginning in January of 2002, plaintiffs leased a portion of the property to Ron Leary
Trucking and Paving Company.  Defs.' Mot. Summ. J., Ex. 24.

On July 1, 2003, Berger sent a letter to plaintiffs stating:

> It is my understanding that for some time now you have leased
> space in more than one building at the above location, which
> constitutes a land development as defined by the Pennsylvania
> Municipalities Planning Code and the Springfield Township Code.
> I also understand that for a great length of time you have promised
> to fulfill your obligations under the two aforementioned pieces of
> legislation by providing a formal land development plan and
> application related to 50 Oreland Mill Road.
>
> I know Richard Lesniak, Code Enforcement Officer/Fire Marshal,
> has attempted to work with you and your consultants in
> formulating a plan, but such a plan still does not exist.
>
> Please accept this letter as formal notice that if a formal land
> development application is not received by Springfield Township
> on or before July 31, 2003, Springfield Township will commence
> enforcement actions to further encourage you to fulfill your
> obligations under the law.[4]

---

[4]   Plaintiffs contend that, "[i]n an effort to placate the Township" after receipt of this letter,
"Plaintiffs hired professionals and submitted a sketch plan."  Pls.' Mem. Supp. Opp'n Summ. J.
14.  The exhibit cited by plaintiffs, however, pre-dates the Township's letter.

Pls.' Opp'n Summ. J., Ex. U.

In lieu of filing an application for land development, however, plaintiffs filed a zoning application on August 29, 2003, requesting a variance from the zoning requirements with respect to parking at the site. Defs.' Mot. Summ. J., Ex. 25. Thereafter, plaintiffs requested multiple continuances of the Zoning Hearing Board hearings, which prompted defendants, on October 13, 2003, to send a letter to plaintiffs' counsel stating, "[i]n light of the extended nature of the continuance request, and the Township's concern about the existing number of tenants at the site, please confirm that the applicants agree to notify the Township if they intend to or do in fact engage in any discussions contemplating new tenants or replacing existing tenants on their property . . . between now and the December zoning hearing." Defs.' Mot. Summ. J., Ex. 26. The Township and plaintiffs' attorneys orally discussed this letter and plaintiffs agreed to an "after the fact" notification of any new tenants. Pls.' Opp'n Summ. J., Ex. HH. In a letter dated October 23, 2003, the Township clarified it wanted notification in advance of the consummation of any agreement with a new tenant or the replacement of an existing tenant. Id. It justified this demand based on plaintiffs' recent attempts to lease space at their site for the staging of recycling trailers despite their awareness that the Township required submission of a land development application for each new tenancy. Id. By way of responsive letter dated November 7, 2003, plaintiffs' counsel denied that plaintiffs had attempted to lease the property without first checking with the Township, but nonetheless agreed to inform the Township if they engaged in "serious discussions" with a new tenant for leasing space at the property. Defs.' Mot. Summ. J., Ex. 27. The author of the Township's letters, Joseph Bagley, could not recall the Township ever requiring similar notice from any other property owner in Springfield Township. Defs.' Mot. Summ. J., Ex. 28, Dep. of Joseph Bagley (Bagley Dep.), 94:1–9.

On November 24, 2003, Lesniak sent another letter to plaintiffs on behalf of the Township because he believed plaintiffs had continued to commit violations of the Property Maintenance Code and the Springfield Township Code.  Defs.' Mot. Summ. J., Ex. 29.  The letter listed the multiple property maintenance violations, the relevant code provisions and plaintiffs' violations resulting from allocation of land on the property for multiple tenants including Ron Leary Paving Company, E-Pak Technologies, Inc., Iggy's Landscaping and PennMark.  Id.  The letter concluded by notifying plaintiffs that they had thirty days to complete all repairs and improvements required to bring the property into compliance, and could seek a modification or withdrawal of the Notice and Correction Order by petitioning the Board of Commissioners.  Id.

As a result of this letter, Collier e-mailed plaintiffs' counsel with a proposed course of action, recommending plaintiffs:  (1) assess and fix the property violations; (2) withdraw the current zoning application "immediately"; and (3) address leaseholds.  Defs.' Mot. Summ. J., Ex. 30.  He noted that Ron Leary Paving was already gone; E-Pak had vacated the property; Iggy's Landscaping had already vacated; and plaintiffs had presumably not gotten permission for the R&S lease and were in violation of the Township Code.  Id.  Finally, Collier noted that, in retrospective, plaintiffs should have concurrently filed the application to the zoning board for a variance and the application for land development of the entire site.  Id.

In February 2004, plaintiffs submitted a land development application to the Township seeking only to lease the existing office building and space within the warehouse to new and existing tenants without any new construction.  Defs.' Mot. Summ. J. Ex. 33.  Township Engineer Amy Riddle Montgomery, P.E. reviewed the plan submission and issued a letter identifying the ways in which the plan did not comply with applicable Township ordinances.  Id.

10

She understood that part of what plaintiffs wanted to do was to continue the existing use of their property.  Pls.' Opp'n Summ. J., Ex. JJ, Dep. of Amy Riddle Montgomery (Montgomery Dep.) 173:14–17.  The Montgomery County Planning Commission also reviewed the application and plans and, by way of letter dated March 24, 2004, recommended approval of the plan "provided that it complie[d] with [the Township's] municipal land development and all other appropriate regulations."  Defs.' Mot. Summ. J., Ex. 34.  The letter further stated that "the plan review comments and recommendations contained in this report are advisory to the municipality and final disposition or the approval of any proposal will be made by the municipality."  Id.  The Township's Planning Commission reviewed the plan on April 6, 2004.  Defs.' Mot. Summ. J., Ex. 35.

Following Township Engineer Montgomery's initial review letter, plaintiffs submitted a revised plan to address and correct the items she identified as problematic.  Montgomery completed a second review and offered a series of zoning ordinance, subdivision and land development ordinance comments, all of which she recommended be addressed to the satisfaction of Springfield Township prior to approval of the land development project.  Pls.' Opp'n Summ. J., Ex. LL.  In response, plaintiffs submitted a second revised plan.  Defs.' Mot. Summ. J., Ex. 37.  This revision prompted a third review letter from Montgomery dated August 4, 2004, again offering multiple comments on the revised plans.  Defs.' Mot. Summ. J., Ex. 38.  Collier testified that the submission of multiple revised plans was very typical in the land development process and Montgomery's reviews were typical of township engineer reviews in a land development submission.  Collier Dep. 138:7–142:13.  Montgomery also concurred that her reviews were very typical of any other land development plan, subdivision plan or zoning review.  Montgomery Dep.  251:17–252:9.

11

During the pendency of the land development application, Code Enforcement Officer/Fire Marshal Lesniak requested that plaintiffs permit him to conduct a use and occupancy inspection of the property in connection with plaintiffs' April 30, 2004 request for use and occupancy certificates for PennMark, Alan Myers Company and Leary Paving. Defs.' Mot. Summ. J., Exs. 40, 41, 42. Lesniak performed his inspection of the property and its buildings and, on June 28, 2004, issued a report identifying numerous code violations that needed correction prior to issuance of use and occupancy permits for those tenants. Defs.' Mot. Summ. J., Ex. 43.

One particular item—the required fire suppression system—became a point of contention between the parties. When PennMark originally occupied the space in April 2003, its activities were limited to car detailing. By the time of the use and occupancy inspection, however, PennMark had taken over the entire warehouse and installed lifts in a portion of the facility to perform automotive repairs. Defs.' Mot. Summ. J., Ex. 44. As a result, Lesniak, in consultation with the Fire Marshal of Upper Dublin Township, required that a fire suppression system be installed in the warehouse. Defs.' Mot. Summ. J., Ex. 43. Plaintiffs objected to that determination and filed an appeal of Lesniak's decision to the Board of Commissioners. Lesniak responded, arguing that "[b]ased on the multiple uses, the size of the building, and the potential that a large fire could occur within the structure, I strongly urge the Board of Commissioners to uphold the Township Code and require the building to be equipped with a fire sprinkler system." Pls.' Mot. Summ. J., Ex. WW. The appeal proceeded alongside the land development application through the summer and fall of 2004.

Plaintiffs' attorney, Christine M. Kimmel, sought to address the Board of Commissioners at their August 9, 2004 workshop meeting to discuss the pending land development application.

Pls.' Opp'n Summ. J., Ex. NN.  The Board, presided over by Schaum, suggested that counsel not attend due to "other issues" to be discussed by the Board.  Id.  Kimmel subsequently attended the general meeting on August 11, 2004, and requested guidance from the commissioners on the land development plan.  Id.  Township Manager Berger remarked that his staff had been provided guidance by the Board and was willing to meet with plaintiffs' counsel directly following the meeting to offer more detailed information.  Id.  In an August 16, 2004 letter, the Township agreed to drop or modify certain of the conditions identified in Montgomery's August 4, 2004 letter, but required plan revision with respect to several of the other items.  Pls.' Mot. Summ. J., Ex. OO.

Upon receipt of that letter, Collier believed that, except for the fire protection issue, plaintiffs had answered the questions raised in the review letter to Montgomery's satisfaction and "other than these few remaining comments, we were near to complete the review process and could expect approval."  Collier Dep. 149:16–24.  He surmised that he and plaintiffs needed to make only a few more adjustments, which would take less than a week to complete.  Id. at 150:7–12.  In late August 2004, however, after Collier had already prepared the reply to the few items remaining on Berger's letter, plaintiffs requested that Collier make no further changes.  Id. at 152:6–23.  Collier believed plaintiffs knew that approval was close, but testified that they gave him no reason for the decision to stop work.  Id. at 153:4–15.  At that point, Collier ceased his work for plaintiffs.  Id. at 154:19–24.

Although plaintiffs stopped all progress on both the land development plans and the fire suppression system, counsel Kimmel continued to seek extensions of time to act on the plans and the appeal.  By way of an October 12, 2004 letter from Township solicitor James Garrity to Kimmel, the Township explained that it would accept extensions of time for the ninety-day land

13

development review period.  He cautioned, however, that if substantial progress with respect to

the filing of satisfactorily-revised land development plans and the amicable resolution of the

Code Enforcement Appeal was not made by the time of the Commissioners' meeting in

November, the Board would deny any further extensions of time and would render decisions on

both the application and appeal based on the paperwork in the file at that time.  Defs.' Mot.

Summ. J., Ex. 47.  At the October 13, 2004 Board of Commissioners' meeting, the Board

extended the ninety-day land development plan review period until November 30, 2004 to

provide plaintiffs the opportunity to bring the land development plans into compliance with the

Township Code.  Pls.' Opp'n Summ. J., Ex. PP.

## VI.   Board of Commissioners' Denial of Plaintiffs' Land Development Application and Affirmation of the Fire Marshal's Decision Requiring a Fire Suppression System

At the November 8, 2004 meeting of the Township Board of Commissioners, the Board

denied plaintiffs' application for land development.  Defs.' Mot. Summ. J., Ex. 48.  In a

November 17, 2004 letter to Kimmel, Berger set forth nine reasons for the denial.  Defs.' Mot.

Summ. J., Ex. 49.  Several of these reasons were conditions that Township had agreed to

abandon in its August 16, 2004 letter.  Id.; Pls.' Mot. Summ. J., Ex. OO.  At the same meeting,

the Board also affirmed the Fire Marshal's decision requiring a fire suppression system based on

Lesniak's August 11, 2004 memorandum describing his investigation.  Defs.' Mot. Sum. J., Exs.

48, 50.  On December 3, 2004, the Township sent plaintiffs a cease and desist letter explaining

that "because a land development plan has not been approved by the Springfield Township

Board of Commissioners and because a fire suppression system has not been installed, this letter

is to provide notice that you and R&S Imports Ltd., Leary Paving, Pennsylvania Department of

Transportation, and Allan Myers Construction have no right to lease or occupy any building or

portion of the property after receipt of this notice for any reason."  Pls.' Opp'n Summ. J., Ex. SS.

The Township Solicitor sent a follow up letter on December 23, 2004.  Pls.' Opp'n Summ. J.,

Ex. TT.

Plaintiffs appealed the decisions of the Board of Commissioners to the Court of Common

Pleas of Montgomery County.  Defs.' Mot. Summ. J., Ex. 51.  In January 2005, the Township

filed an equity action against plaintiffs seeking a court order directing plaintiffs to cease and

desist leasing the property to multiple tenants until the plaintiffs had complied with the law and

secured an approved land development plan.  Defs.' Mot. Summ. J., Ex. 52.

Subsequent to the commencement of the equity action by the Board of Commissioners,

the parties entered into an agreement before the Honorable Joseph A. Smythe on February 10,

2005.  Defs.' Mot. Summ. J., Ex. 53.  The parties reached the following stipulations:

1.      PennMark Auto Group, IV, LP would use only 7,000 square feet of
the warehouse for auto repair.

2.      PennMark would construct or erect some type of a barrier for
segregating or segmenting the auto repair business from the rest of the
building.  Subsequently, plaintiffs' attorney secured a stipulation that the
barrier existing between the two distinct uses in the facility in the
warehouse was already in place and satisfactory to the Township.

3.      PennMark would vacate the building at the end of the initial term
of their current lease, which is April 2006.  If they wished to renew their
lease or move back into the building, they needed to apply for a use and
occupancy permit from Springfield Township.

4.      Any other tenant moving into the building from then on would
have to apply first or the landlord would have to apply for a use and
occupancy permit for the new tenants and have to obtain that permit
before the tenant could obtain occupancy.

5.      Plaintiffs would install a fire detection system.  They would submit
plans for the fire detection system within forty-five days of the present
date to the Township fire marshal for his review and approval.  If plaintiffs
and the fire marshal could not reach an agreement on the design of the fire
detection system, the Township reserved the right to re-apply to the court
for a conference to try to work out those disputes.  This stipulation was

15

subsequently modified so that both parties agreed to the National Fire
Protection Association 72 Manual standards.

6.      Plaintiffs would have an access driveway from the building to
Lynn Avenue.  Plaintiffs would maintain that access driveway free from
obstructions and maintain it at a width of twenty-four feet for access for
fire and emergency vehicles.

7.      Plaintiffs would provide a detailed site and building floor plan for
both buildings in question prepared by a professional indicating all utility
shut offs, fire alarm panels and other facilities and utilities necessary for
the fire department to fight a fire in the buildings.

8.      Plaintiffs would take care of all of the other use and occupancy
issues that were listed in a notice from the code enforcement officer in
June 2004.

9.      The pending land use appeal, filed under a different docket
number, would be severed from the code appeal.  The land use appeal
would proceed to briefing an argument by the parties; and the aspect of the
present motion for preliminary injunction having to do with the land
development approval would be stayed until a final order in that other
Court of Common Pleas matter proceeded to a final order.

10.     The Township would withdraw the currently outstanding citations
with respect to the property at 50 Oreland Mill Road and the Township
would also issue a letter to that effect that those citations were withdrawn.

Id.

The land use appeal proceeded in the same court under docket number 04-32385.  On

October 24, 2005, a two-judge panel entered an order affirming the decision of the Board of

Commissioners with regard to the denial of the land development application.  Defs.' Mot.

Summ. J., Ex. 54.

The court took up the remainder of the Township's equity complaint in Civil Action No.

05-01504 and entered an order on March 22, 2006 on the Township's motion for preliminary

injunction.  Defs.' Mot. Summ. J., Ex. 55.  The order directed plaintiffs to cease and desist from

entering into any leases or lease extensions, except as set forth therein, with tenants or potential

tenants until plaintiffs filed a land development application and plans and obtaining approval.  Id.
In addition, (a) plaintiffs were restrained from using and/or occupying or allowing the use and/or
occupancy of the property by more than one lessee until they fully complied with the Township
Subdivision and Land Development Code; (b) Ron Leary Paving Company was directed to
vacate the property by April 21, 2006; (c) PennMark Auto Group, IV, L.P. was directed to
permanently vacate the property by September 30, 2008; (d) Allan A. Myers was directed to
permanently vacate the property by January 31, 2007; and (e) plaintiffs were restrained from
using and/or occupying the property for their own use and/or occupancy, or that of any
corporation or similar entity owned or operated by either of them until all current tenant have
vacated the premises.  Id.

Plaintiffs have made no efforts to amend or challenge the orders in these cases.  Nor have
plaintiffs appealed to the Commonwealth Court.  As of March 22, 2006, the land use appeal and
equity actions were concluded.

## VII.    Alleged New Tenants at the Property in 2008

On September 23, 2008, District Justice William Householder, who lived on Lynn
Avenue, complained to the Township that the Cheltenham School District was leasing plaintiffs'
property and illegally using the fire emergency access drive onto Lynn Avenue.  Defs.' Mot.
Summ. J., Ex. 56.  Based on that complaint, Berger requested that the new Code Enforcement
Officer and Zoning Officer for the Township, Robert Dunlop, look into the alleged activity and,
if needed, issue a cease and desist order.  Defs.' Mot. Summ. J., Ex. 57.  When Dunlop
investigated, he determined that vehicles on the property were owned by multiple companies,
suggesting that plaintiffs had again leased their property to multiple tenants.  Defs.' Mot. Summ.
J., Ex. 58, Dep. of Robert Dunlop (Dunlop Dep.), 30:2–12, 32:23–8.

As a result of his investigation, Mr. Dunlop sent a letter to plaintiffs notifying them that the current use of the property was not allowed under the terms of the March 22, 2006 court order.  Defs.' Mot. Summ. J., Ex. 59.  Receiving no response from plaintiffs, Dunlop sent another letter dated February 27, 2009 stating, "[o]n several occasions since September of last year, including today, [Dunlop] ha[d] inspected the property and found vehicles registered to different tenants . . . stored at this property."  Defs.' Mot. Summ. J., Ex. 60.  The letter went on to provide:

> You are hereby notified that the current use is not allowed under the terms of the Court Order of March 22, 2006 and Township Code section 95-4, and must be stopped within **Five (5) Days** of your receipt of this letter, or you will be issued a Non-Traffic Citation for failure to comply with Springfield Township code section 95-4.  You have the right to appeal this enforcement action to the Board of Commissioners of Springfield Township.

Id. (emphasis in original).

Again having received no response, Dunlop issued a non-traffic citation against plaintiffs on March 9, 2009, for violating the Township Code by failing to secure an approved land development plan prior to allocating space to an occupant for the purpose of creating a leasehold.  Defs.' Mot. Summ. J., Ex. 16.  Dunlop issued the same citation to plaintiffs for multiple days in March 2009, representing each day the violation continued.[5]  On June 3, 2009, plaintiffs were found guilty by District Justice John S. Murray, III.  Defs.' Mot. Summ. J., Ex. 17.  Plaintiffs appealed the decision to the Court of Common Pleas of Montgomery County.

Simultaneously in March 2009, Dunlop sent a separate letter to plaintiffs notifying them that recent inspections of the property revealed that it was being used as a school bus terminus by First Student, Inc., a use that was not permitted for a property located in the "Industrial" Zoning

---

[5]      Ultimately, between October 2001 and the initiation of this litigation, plaintiffs received at least thirty-six citations.  Pls.' Mot. Summ. J., Ex. A.

District under Township Code section 114-121.  Defs.' Mot. Summ. J., Ex. 62.  He stated that

plaintiffs should stop this usage within five days of receipt of the letter or they would be issued a

non-traffic citation.  Id.  Plaintiffs appealed to the Township's Zoning Hearing Board.  On June

22, 2009, the Zoning Hearing Board determined that the storage of the student buses at the

property was a permitted use and overturned the decision of the Township's Zoning Officer.[6]

Defs.' Mot. Summ. J., Ex. 63.  Plaintiffs continue to lease the property to a school bus company

to this day.

## VIII.  Procedural History

Plaintiffs initiated this federal lawsuit on December 28, 2010, setting forth multiple

claims.  In Count I, plaintiffs allege a claim under 42 U.S.C. § 1983 for violation of the Fifth and

Fourteenth Amendments through their interference with plaintiffs' use off their property.  Count

II sets forth a claim for conspiracy to violate the Fifth and Fourteenth Amendments under 42

U.S.C. § 1985(3).  Finally, in Count V,[7] plaintiffs allege a state law claim of tortious interference

with actual and prospective relations.  The parties proceeded through a lengthy period of

discovery, including an interim appeal to the Court of Appeals.

On June 22, 2015, defendants filed the present motion for summary judgment.  Dkt. No.

69.  Plaintiffs responded on August 13, 2015, Dkt. No. 75, defendants filed a reply brief on

August 24, 2015, Dkt. No. 77, and plaintiffs submitted a sur-reply on September 1, 2015.  Dkt.

---

[6]     Defendants aver that after this decision, plaintiffs advised the Township that First Student would be the only tenant on the property.  In turn, the Township determined that plaintiffs did not need to file an application for land development prior to using the property for the storage of buses by First Student. The Township also agreed to withdraw its opposition to plaintiffs' appeal of the earlier decision by District Justice Murray finding plaintiffs guilty.  Defendants, however, cite no evidence for these facts and, accordingly, I will not consider them.

[7]     The complaint has no Count III or IV.

No. 80.  The matter was then referred to a Magistrate Judge for settlement discussions, which to date have not been successful.

## STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.  To establish "that a fact cannot be or is genuinely disputed," a party must:

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c) (1).

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative or to make credibility determinations.  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998), citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993).  Rather, the court must consider the evidence, and all reasonable inferences that may be drawn from it, in the light

most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  The adverse party must raise "more than a mere scintilla of evidence in its favor" and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  The mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.  Anderson, 477 U.S. at 249–50.

## DISCUSSION[8]

### I.      Procedural Due Process Claim

Plaintiffs' first cause of action alleges a procedural due process violation resulting from defendants' denial of their land use application.  I find no merit to this claim.

---

[8]      Plaintiffs have not distinguished among the defendants with respect to their various claims.  Consistent with the parties' briefing, my discussion of these claims applies to all named defendants unless stated otherwise.

"At the core of procedural due process jurisprudence is the right to advance notice of significant deprivations of liberty or property and to a meaningful opportunity to be heard." Abbott v. Latshaw, 164 F.3d 141, 146 (3d Cir. 1998). In order to successfully establish a prima facie case of a procedural due process violation, a plaintiff must show: (1) there has been a deprivation of the plaintiff's liberty or property, and (2) the procedures used by the government to remedy the deprivation were constitutionally inadequate. See Mulholland v. Gov't of Cnty. of Berks, No. 10–5616, 2012 WL 1057446, at *8 (E.D. Pa. Mar. 29, 2012), aff'd, 706 F.3d 227 (3d Cir. 2013). Remedial procedures will be deemed constitutionally inadequate if "they contain a defect so serious [as to] characterize the procedures as fundamentally unfair." See Leonard v. Owen J. Roberts Sch. Dist., No. 08-2016, 2009 WL 603160, at *4 (E.D. Pa. Mar. 5, 2009), citing Daniels v. Williams, 474 U.S. 327, 341 (1987) (Stevens, J., concurring). In other words, "the focus in procedural due process claims is on the adequacy of the remedial procedure, and not on the government's actual actions that allegedly deprived the individual of his liberty or property interest." K.S.S. v. Montgomery Cnty. Bd. of Comm'rs., 871 F. Supp. 2d 389, 397–98 (E.D. Pa. 2012).

In the context of land use disputes, the Court of Appeals has held that state and municipal officials are constitutionally obliged to offer a means by which individuals may challenge zoning restrictions and other adverse land use decisions. Maple Props., Inc. v. Twp. of Upper Providence, 151 F. App'x 174, 178 (3d Cir. 2005), citing DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d 592, 596–97 (3d Cir. 1995) and Rogin v. Bensalem Twp., 616 F.2d 680, 694–95 (3d Cir. 1980). "The process that is 'due' in a given situation necessarily differs based on the particular circumstances." Maple Props., 151 F. App'x at 177 (citations omitted). For example, a determination of "just compensation" for condemnation of property requires notice and an

opportunity for hearing, while a denial of a license application does not necessitate a hearing as long as prompt administrative or judicial review of the action is available.  Id. at 177–78.

In this case, the Pennsylvania Municipalities Planning Code, 53 P.S. § 10101, et seq. establishes the process by which a person facing an adverse land use decision may challenge that decision.  Section 10909.1 sets forth the administrative review process for decisions by zoning officers or municipal engineers, applications for variances or applications for special exceptions under the zoning ordinances.  53 P.S. § 10909.1.  Article X-A of this statute provides "the exclusive mode for securing review of any decision rendered" under this act.  53 P.S. § 11001-A.  It states that all appeals from all land use decisions shall be taken to the Court of Common Pleas of the judicial district where the land is located.  53 P.S. § 11002-A.  The Court of Appeals has expressly recognized that the Pennsylvania Municipalities Code provides a constitutionally adequate means for those aggrieved by a land use decision to challenge the action in administrative and judicial proceedings.  See Maple Props., 151 F. App'x at 178.

Likewise, both Pennsylvania law and the Township Code provide a means to challenge a Fire Marshal's decision, such as the one at issue in this case.  As defendants accurately note, the Fire Marshal's June 28, 2004 decision pre-dated the adoption of an ordinance opting in to the Pennsylvania Construction Code, 35 P.S. § 7210.101, et seq., and, therefore, was subject to the 1981 BOCA Basic Building Code adopted by the Township in March 1982.  The appeals procedure in that Code designated the Board of Commissioners to hear initial appeals from the Fire Marshal's decision, and provided that the Board's decision would be appealable to the Court of Common Pleas of Montgomery County, the Commonwealth Court and, finally, for allowance of appeal to the Pennsylvania Supreme Court.

Plaintiffs in this case availed themselves of both of these processes.  At the November 8, 2004 meeting of the Township Board of Commissioners, the Board denied plaintiffs' application for land development.  Defs.' Mot. Summ. J., Ex. 48.  At the same meeting, the Board also affirmed the Fire Marshal's decision requiring a fire suppression system.  Defs.' Mot. Summ. J., Exs. 48, 50.  Plaintiffs appealed the decisions to the Court of Common Pleas of Montgomery County.  Defs.' Mot. Summ. J., Ex. 51.  In January 2005, the Township filed an equity action against plaintiffs seeking a court order directing plaintiffs to cease and desist leasing the property to multiple tenants until the plaintiffs had complied with the law and secured an approved land development plan.  Defs.' Mot. Summ. J., Ex. 52.  On February 10, 2005, plaintiffs, the Township and plaintiffs' tenants agreed to a compromise settlement of the fire suppression system issue.  Defs.' Mot. Summ. J., Ex. 53.  The land use appeal proceeded in the same court under Civil Action No. 04-32385.  On October 24, 2005, a two-judge panel entered an order affirming the decision of the Board of Commissioners with regard to the denial of the land development application.  Defs.' Mot. Summ. J., Ex. 54.  Finally, the court took up the remainder of the Township's equity complaint in Civil Action No. 05-01504 and entered an order on March 22, 2006 on the Township's motion for preliminary injunction, directing plaintiff to cease and desist in certain activity.  Defs.' Mot. Summ. J., Ex. 55.  Plaintiffs neither sought reconsideration or amendment of these orders nor appealed the orders to the Pennsylvania Commonwealth Court, as they had the option to do under Pennsylvania law.  Given these undisputed facts, plaintiffs are hard-pressed to argue that the remedial procedures in place were so constitutionally inadequate as to violate plaintiffs' procedural due process rights

In an effort to create an issue of fact, plaintiffs contend the actual application of the process in their case was inadequate.  For example, plaintiffs point out that despite the Board of

Commissioners' grant of an extension until November 30, 2004 for plaintiffs to address the deficiencies in their land use application, the Board voted, on November 8, 2004, to deny plaintiffs' application.  Further, the Commissioners told plaintiffs' counsel not to attend the August 9, 2004 meeting because they would be discussing other matters, only to learn that plaintiffs' land development application was discussed extensively at that meeting.  Finally, when Giuliani, Jr. attempted to speak about his land development application at a public meeting of the Board of Commissioners, he was "summarily silenced" and told by Mr. Schaum to return to his seat.  Pls.' Mem. Supp. Opp'n Summ. J., 62, <u>citing</u> Giuliani Jr. Dep. 728.  Plaintiffs claim that this evidence could lead a reasonable jury to conclude that they were deprived of their full right to be heard.[9]

---

[9]       Plaintiffs also cite a 2004 article from a local Springfield Township newspaper in which one of the Springfield Township Commissioners, Kathleen Lunn, told the newspapers that the Board of Commissioners had a pattern and practice of debating and deciding issues prior to its publicly-advertised meetings, outside the view of constituents.  Pls.' Mem. Supp. Resp. Summ. J. 62 & Ex. TTT.  According to the article, Ms. Lunn described being subjected to instances of political "arm-twisting" during these meetings.  <u>Id.</u>  Further, the article has other statements from former Commissioners Jane Roberts, Ken Bradley and Beth Drezner.  <u>Id.</u>

        This evidence fails to create a genuine issue of material fact for two reasons.  First, this evidence is double hearsay as plaintiffs are relying on statements made by individuals to a newspaper reporter and then published in an article.  Inadmissible hearsay should not be considered during summary judgment.  <u>Smith v. City of Allentown</u>, 589 F.3d 684, 693 (3d Cir. 2009).  Although summary judgment evidence may be presented in a form which is inadmissible at trial, the party offering the evidence "must demonstrate that it could satisfy the applicable admissibility requirements at trial before the evidence may be used on summary judgment."  <u>Robinson v. Hartzell Propeller, Inc.</u>, 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004), <u>appeal dismissed</u>, 454 F.3d 163 (3d Cir. 2006).  This rule requires the proponent to demonstrate that there is more than a "mere possibility that the evidence will be admissible at trial."  <u>Bender v. Norfolk S. Corp.</u>, 994 F. Supp. 2d 593, 600 (M.D. Pa. 2014) (quotations omitted).  In this case, aside from the ambiguous statement that "plaintiffs intend to call one or more witnesses regarding this unlawful practice," Pls.' Mem. Supp. Opp'n Summ. J. 63, plaintiffs have offered no proof—either via affidavits, deposition testimony or even an identification of which witnesses they intend to call— that such testimony will be admissible.  Therefore, I decline to consider it here.

        Moreover, the content of the article does not establish a due process violation.  It talks generally about problems within the Board of Commissioners, but does not provide any evidence of any irregularities in plaintiffs' particular hearings.  Moreover, such a violation would not

This argument is misplaced.  Even assuming the truth of these alleged discrepancies in plaintiffs' appeal to the Board of Commissioners, a jury would have to find that they affected the integrity of the whole process.  See Bellow v. Walker, 840 F.2d 1124, 1128 (3d Cir. 1988) (holding that when a state "affords a full judicial mechanism with which to challenge the administrative decision" in question, the state provides adequate procedural due process whether or not the plaintiff avails him or herself of the provided appeal mechanism).  It remains undisputed that plaintiffs retained the opportunity to appeal to the Court of Common Pleas for Montgomery County, a process of which they availed themselves.  Thereafter, if dissatisfied with the decision of the Common Pleas Court, plaintiffs had the option of appealing to the Commonwealth Court.  They did not do so.  Rather, they reached a compromise settlement on the fire suppression issue and declined to appeal the court's ruling affirming the Township's denial of the land use application.  As they received a full right to be heard, a reasonable jury could not find that plaintiffs were denied their procedural due process rights.  Therefore, I will grant summary judgment in favor of defendants on this claim.

## II.     Substantive Due Process Claim

Plaintiffs next allege that defendants' actions have violated the substantive protections of the Due Process Clause.  They contend that the Township incorrectly and unreasonably insisted that plaintiffs proceed through the land development process simply because multiple tenants occupied the property.  Moreover, they claim to have adduced sufficient evidence from which a reasonable jury could conclude that Mssrs. Schaum and Lesniak acted out of spite and that the

---

necessarily rise to the level of a due process violation.  See Corneal v. Jackson Twp., Huntington Cnty., Pa., 313 F. Supp. 2d 457, 470, quoting Welch v. Paicos, 66 F. Supp. 2d 138, 167 (D. Mass. 1999) ("Even when a planning board abuses its discretion, or disobeys state law in some manner, the federal courts will not automatically find a due process violation."), aff'd, 94 F. App'x 76 (3d Cir. 2004).  Indeed, as discussed above, plaintiffs still had the full range of judicial remedies at their disposal to challenge any irregularities or state law violations.

Township's multiple land use activities with respect to plaintiffs' property were corrupted by "the spiteful and revenge-laden personal motives" of Township officials.  Pls.' Mem. Supp. Opp'n Summ. J. 60–61.  Defendants now assert that the substantive due process claim fails for two reasons:  (1) it is barred by the Rooker-Feldman doctrine and (2) plaintiffs have failed to allege any actions by defendants that "shocks the conscience."  I address each of these arguments individually.

### A.   *Rooker-Feldman* Doctrine

Defendants first contend that the Rooker-Feldman doctrine bars review of plaintiffs' substantive due process claim because plaintiffs seek review and reversal of a state court judgment.  While I agree that the doctrine bars a portion of plaintiffs' substantive due process argument, its narrow span does not encompass the entire claim.

"Under the Rooker–Feldman doctrine, a district court is precluded from entertaining an action, that is, the federal court lacks subject matter jurisdiction, if the relief requested effectively would reverse a state court decision or void its ruling."  Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181, 192 (3d Cir. 2006).  The Supreme Court defined the contours of Rooker-Feldman, explaining that the doctrine deprives the lower federal courts of jurisdiction only in "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).  Rooker-Feldman is not implicated "simply because a party attempts to litigate in federal court a matter previously litigated in state court."  Id.  at 293.  If the matter was previously litigated, as long as the "federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is

27

jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'" Id.

Clarifying this doctrine, the Court of Appeals has held that a federal court lacks jurisdiction only if (1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state-court judgment;[10] (3) the judgment was rendered before the federal suit was filed; and (4) the plaintiff has invited the district court to review and reject the state judgment.[11] Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 166 (3d Cir. 2010). When a "federal plaintiff brings a claim, whether or not raised in state court, that asserts injury caused by a state-court judgment and seeks review and reversal of that judgment, the federal claim is 'inextricably intertwined' with the state judgment." Id. at 170. In deciding whether a claim is inextricably intertwined, the federal court must determine exactly what the state court held. FOCUS v. Allegheny Cnty. Court of Common Pleas, 75 F.3d 834, 840 (3d Cir. 1996) (citations omitted). The court must then articulate the federal relief sought by the plaintiff. Perkins v. Beltway Capital, LLC, 773 F. Supp. 2d 553, 557–58 (E.D. Pa. 2011). If this relief "requires determining that the state court decision is wrong or would void the state court's ruling," then the issues are inextricably intertwined and the federal court lacks subject matter

---

[10]     Under the second element, "the injury must be caused by the state-court judgment, not the defendant. But 'when the source of the injury is the defendant's actions (and not the state court judgments), the federal suit' is not barred by the Rooker–Feldman doctrine, 'even if it asks the federal court to deny a legal conclusion reached by the state court.'" Cycle Chem., Inc. v. Jackson, 465 F. App'x 104, 108 (3d Cir. 2012), quoting Great W. Mining, 615 F.3d at 167.

[11]     Under the fourth element, the Rooker–Feldman doctrine bars a claim "to the extent that adjudicating it would mean that (1) the federal court must determine that the state court judgment was erroneously entered in order to grant the requested relief, or (2) the federal court must take an action that would negate the state court's judgment." Easley v. New Century Mortg. Corp., 394 F. App'x 946, 948 (3d Cir. 2010), quoting In re Knapper, 407 F.3d 573, 580 (3d Cir. 2005)).

jurisdiction.  Id., quoting Laychock v. Wells Fargo Home Mortg., No. 07–4478, 2008 WL 2890962, at *2 (E.D. Pa. July 23, 2008).

As set forth above, plaintiffs' substantive due process argument rests on two broad grounds: (1) the validity of the the Township's position that the Municipalities Planning Code required land development approval for plaintiffs to use their property for multiple tenants[12] and (2) the spiteful and revenge-laden motivations allegedly driving the Township's actions towards plaintiffs.  The Rooker-Feldman doctrine has different applicability for each theory.

To the extent plaintiffs' substantive due process claim is premised on the validity of the Township's decision, their argument is barred by the Rooker-Feldman doctrine.  The land-use issue was precisely the question brought to the Court of Common Pleas of Montgomery County, wherein plaintiffs sought the following relief:

> Wherefore, Appellant [plaintiffs] respectfully requests that this court overrule the Springfield Township Board of Commissioners decision to deny the land development application and to require Appellant to install an automatic fire suppression system in the large motor vehicle repair building/vehicle storage buildings on the subject property.

Defs.' Reply Br., Ex. S-1.  In their accompanying memorandum of law, plaintiffs specifically cited many of the identical cases they now cite here.  Defs.' Reply Br., Ex. S-5.  On October 24, 2005, a two-judge panel entered an order affirming the decision of the Board of Commissioners with regard to the denial of the land development application.  Defs.' Mot. Summ. J., Ex. 54. Through a concurrent equity action filed in January 2005, the Township sought a court order directing plaintiffs to cease and desist leasing the property to multiple tenants until the plaintiffs

---

[12]     Plaintiffs do not include this argument within the section of their brief discussing their due process claim, but rather address it as a separate argument at the outset of the argument section of their brief.  See Pls.' Mem. Supp. Opp'n Summ. J. 32–41.  I assume, for purposes of this opinion, that plaintiffs' intended it as support for their substantive due process claim.

had complied with the law and secured an approved land development plan.  Defs.' Mot. Summ.

J., Ex. 52.  The Court of Common Pleas entered an order on March 22, 2006, granting that

requested equitable relief.  Id.  Plaintiffs did not seek to amend or challenge these orders, nor did

they appeal to the Commonwealth Court.

Undoubtedly, plaintiffs were "state-court loser[s]" on the land use issue.[13]  Their current

action complains, in part, that they were injured by the land-use restrictions placed by the

Township and subsequently affirmed by state-court judgments rendered prior to the

commencement of the present federal action.  The source of this particular injury was the state

court's enforcement of the land use restrictions, not the actions of the defendants.  Adjudicating

this portion of plaintiffs' substantive due process claim and granting the requested relief would

therefore require a review of state law and a determination that the state court judgment was

erroneously entered.  To the extent plaintiffs' substantive due process claim seeks a ruling that

plaintiffs and the state court improperly interpreted the Municipalities Planning Code to deny

them use of their land, this claim is barred by the Rooker-Feldman doctrine.

However, to the extent plaintiffs' substantive due process claim rests on the argument

that the Township's multiple land use decisions were corrupted by "the spiteful and revenge-

laden personal motives" of Township officials, the Rooker-Feldman doctrine does not bar their

cause of action.  This argument alleges that plaintiffs suffered a multitude of other injuries

caused not by the state court judgment, but rather by the conduct of defendants themselves.

Specifically, plaintiffs argue that Mssrs. Schaum and Lesniak acted out of spite in an effort to

exact revenge on plaintiffs' for rent-collection activities against them.  Pls.' Mem. Supp. Opp'n

---

[13]      Plaintiffs disagree that they were a "loser" in the state court because a substantial portion
of the state-court litigation was resolved through the entry of a stipulated agreement, precluding
a ruling that established a "winner" or "loser."  As described above, however, the state court
specifically entered a ruling on the Township's land use decision.

Summ. J. 60–61.  Moreover, they contend that defendants continued their vindictive behavior towards plaintiffs after a 2007 Pennsylvania Supreme Court ruling undermined defendants' position.  Such allegations concern an injury allegedly incurred prior to or apart from the state court judgment.  I find that such allegations are not barred by the Rooker-Feldman doctrine and will consider them on their merits.

> **B.**     **Conscience-Shocking Behavior**

I now turn to the question of whether plaintiffs have adduced sufficient proof of behavior that violated their substantive due process rights.  As I find they have not, I will grant summary judgment on this claim.

The substantive component of the Due Process Clause bars certain arbitrary and wrongful government actions that would deprive an individual of life, liberty, or property.  U.S. Const., amend. XIV § 1; see also Tazioly v. City of Phila., No. 97-1219, 1998 WL 633747, at *7 (E.D. Pa. Sept. 10, 1998), citing Zinermon v. Burch, 494 U.S. 113, 125 (1990).  The first step in assessing a substantive due process claim is to identify the constitutional interest that was allegedly aggrieved.  Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008).  In order to successfully make out a substantive due process claim in the context of local land use regulations, "a plaintiff must establish as a threshold matter that he has a property interest protected by the Fourteenth Amendment's due process clause."  Maple Props., Inc. v. Twp. of Upper Providence, No. 00-4828, 2004 WL 2579740, at *2 (E.D. Pa. Nov. 12, 2004), citing Independent Enters. Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1179–80 (3d Cir. 1997).  Here, plaintiffs own a piece of land that was affected by the Township's land use regulations, and therefore have established the presence of a property interest entitled to due process protection. See Maple, 2004 WL 2579740, at *2, citing DeBlasio v. Zoning Bd. of

Adjustment for Twp. of W. Amwell, 53 F.3d 592, 600 (3d Cir. 1995); see also Cherry Hill

Towers, LLC v. Twp. of Cherry Hill, 407 F. Supp. 2d 648, 654 (D.N.J. 2006) ("As owner of the

Cherry Hill Towers property, Plaintiff clearly has a property interest protected by due process.").

 I must next ascertain whether the identified property interest has, in fact, been aggrieved

by the government.  Maple Props., 2004 WL 2579740, at *2.  Government action does not

violate substantive due process when merely prompted by an "improper motive."  Cnty.

Concrete Corp. v. Town of Roxbury, 442 F.3d 159, 169 (3d Cir. 2006).  Rather, the Court of

Appeals defined the standard for determining substantive due process violations as government

action that rises to the level of "shocking the conscience."  United Artists Theatre Circuit v.

Township of Warrington, 316 F.3d 392, 400 (3d Cir. 2003).  While there is no "calibrated yard

stick" upon which to measure such conduct, the Supreme Court has recognized that "only the

most egregious official conduct" qualifies.  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 425 (3d

Cir. 2006), citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845, 847 n.8 (1998); see also

Cherry Hill Towers, 407 F. Supp. 2d at 655.

 In the land-use context, whether a zoning official's actions or inactions violate due

process is similarly determined by utilizing a "shocks the conscience" test.  Eichenlaub v. Twp.

of Indiana, 385 F.3d 274, 285 (3d Cir. 2004), citing United Artists, 316 F.3d at 399.  "[T]his test

is designed to avoid converting federal courts into super zoning tribunals."  Eichenlaub, 385 F.3d

at 285.  Indeed, the Court of Appeals noted that:

> [E]very appeal by a disappointed developer from an adverse ruling of the local
> planning board involves some claim of abuse of legal authority, but "[i]t is not
> enough simply to give these state law claims constitutional labels such as 'due
> process' or 'equal protection' in order to raise a substantial federal question under
> section 1983." . . . Land-use decisions are matters of local concern, and such
> disputes should not be transformed into substantive due process claims[.]

United Artists, 316 F.3d at 402, quoting Creative Env't, Inc. v. Estabrook, 680 F.2d 822, 833 (1st Cir. 1982).

In Eichenlaub v. Twp. of Indiana, the Court of Appeals provided the lower courts with some guidance on what qualifies as conscience-shocking behavior in the land use context, including:  evidence of "corruption or self-dealing," the hampering of development in order to interfere with otherwise constitutionally-protected activity, municipal action reflecting "bias against an ethnic group," or evidence indicating a "virtual taking" of the claimant's property. 385 F.3d at 286.  By the same token, the Court of Appeals listed examples of conduct that is not sufficiently egregious or outrageous, such as:  applying certain regulations to one parcel of property but not to others, making unannounced or unnecessary inspections of the property, delaying permits and approvals, improperly increasing tax assessments or "malign[ing] or muzzl[ing]" claimants.  Id.  While these lists are not exhaustive, the Court of Appeals has noted that allowing only the most outrageous conduct to qualify as conscious shocking prevents federal courts from "being cast in the role of a 'zoning board of appeals.'"  United Artists, 316 F.3d at 402, quoting Estabrook, 680 F.2d at 833.

Following Eichenlaub, courts have remained hesitant to find conscience-shocking behavior in the land use context absent some showing that the conduct was permeated with either self-dealing or corruption.  See, e.g., Skiles v. City of Reading, 449 F. App'x 153, 158 (3d Cir. 2011) (argument that defendants sought to destroy the economic viability of the plaintiff's residential and commercial properties through their enforcement of various zoning, residential and health regulations showed only that the plaintiff was, at best "an aggrieved property owner, which is insufficient to sustain a substantive due process claim"); Locust Valley Golf Club, Inc. v. Upper Saucon Twp., 391 F. App'x 195, 199 (3d Cir. 2010) (declining to find substantive due

33

process violation in claims that defendant township officials declined to rezone property to allow for development by plaintiff, manipulated a special study, wrongfully blocked the property development because one of the defendants sought to buy the land himself, delayed certain permits and approvals, increased tax assessments and "maligned and muzzled" plaintiffs; "these complaints are examples of the kind of disagreement that is frequent in planning disputes" and evidence, at most, mere improper motives that do not shock the conscience); Highway Materials, Inc. v. Whitemarsh Twp., 386 F. App'x 251, 258 (3d Cir. 2010) (declining to find that "shock the conscience" standard was met where plaintiff claimed that defendant township officials intentionally refused to cooperate with it, improperly applied township ordinances, treated it differently from nearby owners and actively sought reasons to deny it the opportunity to develop its land; "[i]f defendants intentionally misapplied the ordinances and disregarded their duty under Pennsylvania law to conduct a good-faith evaluation of HMI's proposal, that 'remains only a violation of state law'").

In the present case, plaintiffs describe two lengthy episodes of conscience-shocking behavior as allegedly sufficient to survive summary judgment.[14]  I address their contentions individually.

---

[14]      Plaintiffs argue that they "would be in possession of even more evidence supporting their claims had defendants' taken appropriate preservation efforts, promptly searched for documents, not destroyed e-mails and simply complied with their own document retention policy for all of the reasons set forth in their submissions in support of their Motion for Spoliation Sanctions." Pls.' Mem. Supp. Opp'n Summ. J., 58 n.25.  They go on to assert that this lost or deleted evidence "should estop Defendants' effort to gain a summary judgment on the basis of insufficient evidence." Id.  I addressed this argument in my memorandum and order of June 9, 2015 and found that no spoliation inference was warranted.  Plaintiffs' current argument is simply a request that I reconsider this decision.  I decline to do so.

###### 1.     Township's Actions Regarding the Property from 2001–2006

First, plaintiffs claim to have adduced sufficient evidence from which a reasonable jury could conclude that, during the time period from 2001 to 2006, the Township's multiple land use decisions were corrupted by "the spiteful and revenge-laden personal motives" of Township officials.  Pls.' Mem. Supp. Opp'n Summ. J. 60–61.  They contend that they were repeatedly harassed and cited for not securing land development approval even though all they wished to do was to continue leasing their property to existing tenants, consistent with the use of their parcel for decades.  Id. at 40.  Further, defendants purportedly kept changing their reason for mandating that plaintiffs proceed through the formal land development process.  Id. at 41.  Plaintiffs conclude that the "fact-intensive nature of the standard counsels against lightly dismissing claims at the summary judgment stage that should be considered by a jury with a full opportunity to see and hear all of the evidence and, critically, to assess the credibility of witnesses who, in this case, tell starkly different stories regarding the same events."  Pls.' Mem. Supp. Opp'n Summ. J. 60.

Having reviewed the parties' submissions, I find no genuine issue of material fact exists on which a reasonable jury could find conscience-shocking behavior from 2001–2006.  First, aside from speculation that many of the Township defendants must have been acting out of some need for revenge or spite towards plaintiffs, the record before me is devoid of any evidence from which a reasonable jury could find such motivations.  Plaintiffs argue that "their efforts to collect delinquent rent [from their tenants] made enemies of several politically connected and powerful people—most notably, defendants Glenn Schaum and Richard Lesniak," both of whom bore a tenuous connection to the Fellwick Fire Association that had to move off the property due to non-payment of rent.  Pls.' Mem. Supp. Opp'n Summ. J. 7.  Plaintiffs, however, have produced no proof from which such revenge-laden motivations can be inferred.  Quite to the contrary, the

record reflects that plaintiffs were repeatedly informed that they needed land development approval, but delayed in submitting applications and repeatedly acted in violation of the Township's directives.  When plaintiffs finally engaged consultant Rick Collier, plaintiffs' land development application progressed to Township review in typical fashion.  Although they complain of being frustrated by delays, plaintiffs admit, in their response to summary judgment, that "the land development approval process is frequently long and difficult" and they knew the process would be "long and expensive."  Pls' Mem. Supp. Opp'n Summ. J. 51.  They also admit to knowing that the process could "go on for years and typically require anywhere from two to ten reviews and plan submissions."  Id. at 52.  Yet, despite their application nearing completion of the review process, plaintiffs halted their representative's work and instructed him to make no further changes on the application.  Collier Dep. 149:16–24, 152:6–23.  Absent the appropriate revisions, the Township denied the application.  That decision was subsequently affirmed by the Court of Common Pleas. [15]  While plaintiffs may not have liked the ultimate outcome, the

---

[15]     Plaintiffs argue that simply because the state court ruled in favor of defendants does not mean that defendants' actions were not conscience-shocking.  In support of this argument, plaintiffs cite to two cases that are distinguishable from the present matter.  First, in Garlasco v. Stuart, 602 F. Supp. 2d 396 (D. Conn. 2009), the plaintiff had applied for a variance, which was denied by the defendant zoning board.  Id. at 403.  Defendant, a First Selectman with the township, sought to buy the property for a reduced value and conditioned his offer on a threat that if the plaintiff did not sell the property to him, the defendant would use his position to deny the plaintiff the necessary permits.  Id.  Plaintiff thereafter appealed the zoning board's decision in the Connecticut Superior Court, but lost the appeal.  Id.  Subsequently, the defendant engaged in a pattern of harassment, threatening the plaintiff with arrest and imprisonment unless he left the property and blocking the entrance of the property using township resources such as dirt and crushed stone landfill.  Id. at 404.  The court denied summary judgment on a substantive due process claim against the defendant town selectman for his actions in blocking the property, but found that the plaintiff had failed to state a viable due process claim in connection with the denial of the variance and the driveway permit.  Id. at 405.  The present case involves no similar allegations of conscience-shocking behavior analogous to that of the town selectman, but rather focuses on evidence analogous to that involving the denial of the land use application on which the court granted summary judgment.

substantive due process clause cannot step in to remedy what appears a mere garden-variety land use dispute.

More importantly, even assuming plaintiffs could prove defendants' land use actions and decision were arbitrary or prompted by "spiteful and revenge-laden personal motives," the Court of Appeals has explicitly held that mere improper motivations are insufficient to state a substantive due process claim.  United Artists, 316 F.3d at 400.  "[T]he politics and animosities that often animate local decision-making are not matters of constitutional concern."  Maple Props., Inc. v. Twp. of Upper Providence, 151 F. App'x. 174, 179–80 (3d Cir. 2005).  Rather, a substantive due process claim in a land-use dispute requires conscience-shocking behavior.  Plaintiffs have not established any such conscience-shocking behavior such as evidence of corruption or self-dealing, efforts to interfere with otherwise constitutionally-protective activity, bias against an ethnic group or evidence of a virtual taking of the property.  Eichenlaub, 385 F.3d at 286.  Instead, plaintiffs have only alleged the type of behavior that the Court of Appeals has specifically found to be not sufficiently egregious:  making unannounced or unnecessary

---

Similarly, in Andrews v. Bureau of Codes Administrative Office, No. 08-1669, 2012 WL 610333 (M.D. Pa. Feb. 24, 2012), the plaintiff received a condemnation order on his property from the defendant requiring that she procure appropriate permits to rehabilitate or face demolition of an existing structure.  Id. at *2.  She claimed that she wanted to appeal, but was unable to do so for financial reasons.  Id.  On several occasions, a defendant inspector returned to the property due to complaints and, seeing no evidence of any rehabilitative work, issued citations.  Id.  The plaintiff did not attend a subsequent hearing on the citations and was found guilty.  Id.  She appealed to the Court of Common Pleas and was again found guilty.  Id. at *3.  She ultimately sold the property for far less than its value.  Id.  The court found that plaintiff's substantive due process claim "narrowly survive[d]" summary judgment.  Id. at *11.  It reasoned that although the defendants' actions were based at least partly on legitimate land use concerns, there was possible conscience-shocking behavior based on plaintiff's evidence that the defendants exhibited disparate treatment toward minority home owners as compared to similarly-situated non-minority property owners.  Id.  These potentially racially-motivated biases were sufficient to support a substantive due process claim.  Id.  In this case, plaintiffs have alleged no similar incidents of racially-motivated biases that could support a substantive due process violation.

inspections of their property, delaying review of the applications, requiring compliance with land development regulations for minor changes in the property, citations and threats of legal action if plaintiffs did not comply with the required action, refusal to include plaintiffs' attorney in meetings of the Township Board of Commissioner and ruling on the land use application prior to the expiration of an agreed-upon extension of time.  To allow such alleged behavior to rise to the level of a substantive due process violation would improperly cast the federal court in the role of a zoning board of appeals.

### 2.    The Township's Actions Regarding the Property in 2008–2009

Plaintiffs also argue that even when the Pennsylvania Supreme Court repudiated the Township's position on the land-use ordinances in a 2007 decision, the Township continued to "repeatedly and vindictively cite the plaintiffs for failure to submit a development plan as late as 2009."  Pls.' Mem. Supp. Opp'n Summ. J. 41.  Specifically, in the 2007 case of Upper Southampton Twp. v. Upper Southampton Twp. Zoning Hearing Bd., 934 A.2d 1162 (Pa. 2007), the Pennsylvania Supreme Court held that the construction of billboards does not qualify as "land development" for purposes of the Municipalities Planning Code, 53 P.S. § 10107 and the Township Subdivision and Land Development Ordinance § 202—the same statutes at issue here—and therefore does not authorize a township to require land development.  Id. at 1170.  In doing so, it reasoned that

> it would be an absurd or unreasonable reading of the statute to conclude that a use that does not involve such development of the land becomes one merely because the property owners granted appellant the right to erect the billboards through leaseholds, rather than erecting the billboards on their own.  The leases, by themselves, cannot convert a use of land that does not rise to the level of land development to a use that does.

Id. at 1169–70.  Plaintiffs contend that despite this decision, which "squarely repudiate[d]" the Township's position on land-use development, the Township continued to repeatedly and vindictively cite plaintiffs for failure to submit a development plan.  Pls.' Mem. Supp. Opp'n Summ. J. 41.  They conclude that "this brazen disregard for the law is illustrative of the sort of conduct a jury may find conscience-shocking and makes the entry of summary judgment inappropriate in this case."  Id.

Again, I must disagree.  Even if Upper Southampton had provided unequivocal guidance ignored by the Township, [16] no federal due process violation exists based on a mere violation of state law.  In Chesterfield Development Court v. City of Chesterfield, 963 F.2d 1102 (8th Cir. 1992), a case cited with approval by our Court of Appeals, the Eighth Circuit faced a claim by a developer that the city had violated its substantive due process rights by enforcing an invalid zoning plan against it.  Id.  at 1103–04, cited in Lindquist v. Buckingham Twp., 106 F. App'x 768, 774 (3d Cir. 2004).  The court held that "a state-law error, no matter how fundamental, cannot in and of itself create a federal due process violation."  Id. at 1105.  The Eighth Circuit went on to note that "[its] decision would be the same even if the City had knowingly enforced

---

[16]      Notably, Upper Southampton had no bearing on the Township's decisions.  As noted above, the Township's actions in 2008 were prompted by a complaint that the Cheltenham School District was leasing plaintiffs' property and illegally using the fire emergency access drive.  Defs.' Mot. Summ. J., Ex. 56.  Defendants investigated the activity and determined that vehicles on the property were owned by multiple companies.  Defendants, however, did not insist that plaintiffs were in violation of the Municipal Planning Code or the Subdivision and Land Development Ordinance—which were the issues addressed in Upper Southampton—but rather notified plaintiffs that their practices were not in accordance with the standing March 22, 2006 court order that prohibited multiple tenants on the property.  When plaintiffs did not respond to several cease and desist notices, the Township issued non-traffic citations for each of the days that plaintiffs failed to secure an approved land development plan, citations upheld by a District Justice and appealed by plaintiffs to the Court of Common Pleas.  Because the citations were based on plaintiffs' violation of the court order, and not an allegedly erroneous interpretation of the Municipal Planning Code or Land Development Ordinance, defendants' citation of plaintiffs cannot be deemed conscience-shocking.

the invalid zoning ordinance in bad faith" because "[a] bad faith violation of state law remains only a violation of state law." Id.; see also Hwy. Materials, Inc. v. Whitemarsh Tsp., 386 F. App'x 251, 258 (3d Cir. 2010) ("If defendants intentionally misapplied the ordinances and disregarded their duty under Pennsylvania law to conduct a good-faith evaluation of HMI's proposal, that 'remains only a violation of state law.'"); Baker v. Coxe, 230 F.3d 470, 474 (1st Cir.2000) ("[E]ven an arbitrary denial of [a building] permit in violation of state law—even in bad faith—does not rise above the constitutional threshold for equal protection and substantive due process claims.").

Likewise, in this matter, defendants' attempted enforcement of an allegedly unreasonable interpretation of the Municipal Planning Code and Subdivision and Land Development Ordinance, even if directly contrary to Pennsylvania law, would be merely a violation of state law. Such actions do not constitute a "truly irrational" governmental action giving rise to a substantive due process claim.

### 3.      Conclusion as to Substantive Due Process Claim

In light of the foregoing, I find that plaintiffs' substantive due process claim does not survive summary judgment review. Plaintiffs' challenge to the Township's interpretation of the land-use ordinances at issue is barred by the Rooker-Feldman doctrine. The remainder of plaintiffs' argument fails to adduce any evidence of action by defendants that is so egregious and extraordinary that it "shocks the conscience." Finding no issue of material fact on this claim, I will grant summary judgment in favor of defendants on the substantive due process cause of action.

**III.     Equal Protection Claim**

Defendants next seek summary judgment on plaintiffs' equal protection claim.  Plaintiffs respond that they have adequately established a "class of one" equal protection claim based on the Township's harsher treatment of plaintiffs over other, similarly-situated property owners within the Township.  Upon consideration, I find this claim meritless.

The United States Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (internal citations omitted).  In Olech, a municipality conditioned water service for a property on the plaintiff-owner's granting a thirty-three-foot easement, even though it required only a fifteen-foot easement from every other property owner.  Id. at 563.  The Supreme Court allowed the plaintiff to proceed on the class-of-one theory, finding that allegations of irrational and wholly arbitrary treatment, even without allegations of improper subjective motive, were sufficient to state a claim for relief under equal protection analysis.  Id. at 565.

A plaintiff asserting a "class of one" claim "must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment."  Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006); see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008).  "These challenges fail when 'there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'"  Hwy. Materials, 386 F. App'x at 259, quoting Heller v. Doe, 509 U.S. 312, 320 (1993).  Notably, an equal protection claim is not "a device to dilute the

stringent requirements needed to show a substantive due process violation."  Eichenlaub, 385 F.3d at 287.

In the present case, defendants argue that plaintiffs have failed to adduce proof either that their property is similarly situated to other properties in Springfield Township or that defendants lacked a reasonable basis for their actions.  I address each argument individually.[17]

### A.  Similarly-Situated Properties

The "first inquiry a court must make in an equal protection challenge to a zoning ordinance is to examine whether the complaining party is similarly situated to other uses that are either permitted as of right, or by special permit, in a certain zone."  Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 137 (3d Cir. 2002).  "Persons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects."  Startzell v. City of Philadelphia, 533 F.3d 183, 203 (3d Cir. 2008) (internal citations and quotation marks omitted).  "Determining whether an individual is 'similarly situated' to another individual is a case-by-case fact-intensive inquiry."  Suber v. Ginta, 902 F. Supp. 2d 591, 607 (E.D. Pa. 2012), citing Monaco v. Am. General Assurance Co., 359 F.3d 296, 305 (3d Cir. 2004).  Nonetheless, "the case law makes clear that the burdens of production and persuasion must be shouldered by the party asserting the equal protection violation."  Cordi-Allen v. Conlon, 494 F.3d 245, 250 (1st Cir. 2007); see also Young v. Twp. of Coolbaugh, 276 F. App'x 206, 209 (3d Cir. 2008) ("At the summary judgment stage . . . [the plaintiff] must do more than simply allege the existence of

---

[17]    Defendants also contend that the Equal Protection claim is barred by the Rooker-Feldman doctrine.  As discussed in detail above, Rooker-Feldman is a narrow doctrine that applies only when a plaintiff is claiming injuries caused by a state court judgment.  Plaintiffs' equal protection claim, however, does not call into question the validity of the state court ruling, but rather challenges defendants' actions in attempting to enforce land-use regulations against plaintiffs that they did not enforce against similarly-situated properties.  As I find that Rooker-Feldman is inapplicable here, I proceed to the merits of plaintiffs' equal protection claim.

similarly situated proposals and argue that the [defendant] failed to disprove that it discriminated against [the plaintiff].  Rather, he must produce evidence of similarly situated proposals that were treated differently from his own land development proposal.").  "Thus, the proponent of the equal protection violation must show that the parties with whom he seeks to be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile."  Cordi-Allen, 494 F.3d at 251. In cases involving zoning or land-use disputes, courts consider "the similarity of the properties being compared, including their physical characteristics and their 'similarities in the eyes of a defendant.'"  Jeffers v. City of Wash., No. 14-1361, 2015 WL 4232662, at *3 (W.D. Pa. July 13, 2015) (quotations omitted).  Summary judgment is appropriate where a plaintiff fails to point to a single property or land development proposal or property that is similar situated, but treated differently.  Young, 276 F. App'x at 209.

Plaintiffs identify six different properties, which they allege are similarly-situated to their property, but received more favorable treatment from the Township.  In support of their argument, they provide the following evidence regarding these properties:

- Vecchione Property:  The similarly-sized Vecchione property is located at 110 Oreland Mill Road, which is an area zoned as industrial.  Giuliani Jr. Dep. 638:12–19.  Plaintiff Giuliani, Jr. explained that the property is used by different lessees as a contractor's yard, truck depot, paint shop and repair facility, and it contains a cell tower.  Id. at 638:20–639:4.  He stated that he could see that property from his property and knew that it had piles of sand and asphalt, as well as debris, which were conditions that defendants raised about his property.  Id. at 639:5–17.  Giuliani, Jr. could not recall the owner of the Vecchione property ever mentioning that the Township had bothered him about the usage of his property.  Id. at 640:6–42:24.

- Met Lab Property:  The Met Lab Building is also in an industrial zone.  Giuliani Jr. Dep. 650:20–51:3.  Giuliani, Jr. explained that the property is used as a trucking depot, to house landscaper-type tenants and for various offices.  Id. at 651:14–16.  He believed that property was treated more favorably than his property because when he drove past it, he noticed high weeds, broken windows, trash, scattered debris and multiple tenants.  Id. at 651:17–20.

- Brandenberg/Sheridan Property:  The Brandenberg/Sheridan property is also zoned industrially and has multiple tenants.  Id. at 662:10-63:16.  Giuliani, Jr. believed that that although the property started the land development process, it was ultimately only required to put up a few trees and arborvitae to help screen the street.  Id. at 663:20–64:7.  Giuliani, Jr. based his beliefs only on his observations of the property and reading about it in the local paper.  Id. at 664:8–24.

- Kurtz Roofing Property:  Although plaintiffs identify the Kurtz Roofing property as a comparator, they provide no evidence regarding this property.

- Tank Car Corporation Property:  The Tank Car Corporation of America property was also located on the other side of the train tracks from plaintiffs' property and in industrial zoning.  Giuliani Jr. Dep. 646:22–47:7.  Giuliani, Jr. stated the property was used by Tank Car for sand blasting and painting of rail cars, but also had other types of operations such as truck parking, landscape storage, material storage, yard storage and truck depot.  Id. at 647:9–18.  Giuliani, Jr. believed that the property was treated differently than his property because while the Township required plaintiffs to repair broken windows in their buildings, the Tank Car property seemed to have similar buildings with broken windows.  Id. at 648:4–12.

- Mr. Storage Property:  The Mr. Storage property is a self-storage building in industrial zoning.  Giuliani Jr. Dep. 654:9–55:4.  Giuliani, Jr. noted that it was originally a manufacturing building, but was converted to self-storage during the relevant time in this case.  Id. at 655:10–56:19.  He believed that property had received favorable treatment because it has extremely limited parking, which was an issue the Township raised with the plaintiffs' property.  Id. at 657:13–21.  In addition, Guiliani, Jr. said there is a dissimilarity in the number of trees required between the two sites.

At first blush, the mere volume of plaintiffs' briefing appears to set forth evidence of similarly-situated properties that received more favorable treatment from defendants.  A closer review of the depositions and exhibits cited, however, reveals that the cited properties are not similarly situated to plaintiffs' property and, in fact, have multiple distinguishing characteristics.

First, with respect to Vecchione, Met Lab, Brandenberg/Sheridan and Kurtz Roofing properties, the owners of all of these properties sought and received from the Township Board of Commissioners a waiver of the formal land development process.  Defs.' Mot. Summ. J., Ex. 64, Berger Decl., ¶¶ 7A, 7B, 7D; Pls.' Opp'n Summ. J., Exs. HHH, III, JJJ; Berger Dep. 698:16–702:24.  Township Manager Berger explained that a land development applicant can ask for a

waiver from either the entire land development process or a portion hereof.  Berger Dep. 691:1–
4.  He explained that the request for a waiver must be in writing and must come from the
applicant, either through the property owner himself or from the engineer or attorneys.  Id. at
696:4–97:4.  To his knowledge, plaintiffs never requested a waiver of the land development
process, either personally or through their representative Richard Collier.[18]  Id. at 697:22–98:6.
Collier confirmed that he never requested a waiver, or even discussed the idea with plaintiffs,
because he did not believe the Township was open to the idea.[19]  Collier Dep. 11–62.  In fact, at
a late stage of their land development application process, plaintiffs chose to abandon efforts to
revise their plans to comply with the remaining Township requirements.  None of the identified
properties faced similar scenarios.

Second, as to the Tank Car property, plaintiff has not adduced sufficient evidence that it
was similarly situated.  Plaintiffs present only Giuliani Jr.'s speculations that the Township
treated the property more favorably without evidence of any such differential treatment.
Contradicting Giuliani Jr.'s unsupported beliefs, defendants have provided a declaration from
Berger stating that the owner of the Tank Car property had refused to go through the land
development review process for their plans to install office trailers, a fuel tank, lights and
fencing, causing the Township to file a Court of Common Pleas action for injunctive relief to
stop the project and compel the filing of a land development application.  Berger Decl. ¶ 7.E.

---

[18]     Berger also noted that, during the time period relevant to this case, there were numerous
other properties whose owners requested and were denied waivers, either in whole or in part.
Berger Dep. 701–03, 709–11, 716–18.

[19]     Plaintiffs argue that they did not believe a waiver was possible based on the Township's
statements.  They go on to note that if a waiver seemed remotely feasible, one of plaintiffs' hired
professionals would have likely sought one.  Pls.' Mem. Supp. Opp'n Summ. J. 29–30.  I find no
facts of record, however, that allow the reasonable inference that had plaintiffs sought a waiver,
it would have been denied out of hand.

The court granted the injunction and required the owner to go through the formal land development review process, and the owner of the property relocated its school bus storage to plaintiffs' property.  Id.

Finally, with respect to the Mr. Storage property, plaintiffs offer no evidence of differential treatment other than Giuiliani, Jr.'s unsupported beliefs.  Filling in the gaps in Giuliani, Jr.'s knowledge, Berger clarified that, unlike plaintiffs' property, the Mr. Storage property was considered "single use" and not used for multiple tenants.  It received approval on its land development plan with seven conditions including securing of zoning relief from a setback requirement, which the Zoning Hearing Board granted.  Mr. Storage owner was also granted a variance from the Township Zoning Hearing Board to reduce the number of required parking spaces.  Berger Decl. ¶ 7.C.

In short, plaintiffs have proffered comparators that, at best, are similar in discrete respects, but differ on their most important characteristics, "render[ing] the comparison inutile." Cordi-Allen, 494 F.3d at 251. [20]  Given the obvious, crucial and undisputed distinguishing circumstances between plaintiffs' property and the identified comparators, no reasonable jury could find that these properties were similarly-situated for purposes of establishing an equal protection violation.

---

[20]     In an effort to temper the impact of Berger's declaration on the issues, plaintiffs contend that Berger's declaration "merely underscores the existence of a factual dispute between Plaintiffs and Defendants as to what properties should be considered similarly situated for purposes of an equal protection analysis" and "[t]he existence of that dispute is surely no reason to grant summary judgment."  Pls.' Mem. Supp. Opp'n Summ. J. 46.  They argue that Berger's credibility must be assessed by a jury.  Plaintiffs are mistaken.  "[A]n opponent may not prevail merely by discrediting the credibility of the movant's evidence; it must produce some affirmative evidence."  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### B.  Rational Basis for the Township's Actions

Even assuming arguendo that a genuine issue of material fact exists on the presence of similarly-situated properties treated more favorably, plaintiffs have not shown that the Township's actions were "irrational and wholly arbitrary" or that plaintiffs were intentionally singled out for adverse treatment based on considerations that are wholly divorced from any legitimate government concern.  Village of Willowbrook, 528 U.S. at 565.  "[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness or logic'" of government activity.  Heller v. Doe by Doe, 509 U.S. 312, 319 (1993), quoting FCC v. Beach Comm'cns, Inc., 508 U.S. 307, 313 (1993).  "These challenges fail when 'there is any reasonably conceivable state of facts that could prove a rational basis for the classification."  Highway Materials, Inc. v. Whitemarsh Twp., 386 F. App'x 251, 259 (3d Cir. 2010), quoting Heller, 509 U.S. at 320.  The irrational and wholly arbitrary standard is difficult to meet in a land use case and it "may be very unlikely that a claim that fails the substantive due process test will survive under an equal protection approach."  Eichenlaub, 385 F.3d at 287.

As repeatedly detailed above, defendants in this case have offered legitimate, rational bases for (a) requiring plaintiffs to proceed through the land use development process; (b) denying their land-use application; and (c) citing plaintiffs when they were not in compliance with the relevant ordinances.  Absent contrary evidence from plaintiffs, it is beyond the purview of this court to determine that the Township's ordinances were frivolous or that its denial of plaintiffs' land use application was wholly arbitrary.

Attempting to meet their heavy burden of establishing that there was no "reasonably conceivable state of facts that could provide a rational basis for the classification," Hwy. Materials, 386 F. App'x at 259, plaintiffs flood their brief with a scattershot citation to isolated

47

pieces of evidence.  They go on to argue that, if presented with the whole picture, a jury could

reasonably find that defendants irrationally and arbitrarily treated plaintiffs differently.  Plaintiffs

have clearly mischaracterized much of the evidence they cite, rendering any dispute of fact not

genuine.  For purposes of comprehensiveness in my grant of summary judgment on this claim, I

review each allegation:

- *Plaintiffs' argument:*  Plaintiffs contend that while the Township "ordinarily" let the
  pace of land development applications be dictated by the applicant, the Township
  declined to afford plaintiffs additional time for their application.
  *The evidence of record:*  The evidence shows that the Township granted plaintiffs'
  requested extensions for their land development application and code enforcement
  appeal.  Pls.' Opp'n Summ. J., Ex. ZZ.  The Township explained, however, that no
  further extensions would be granted, as follows: "Ordinarily, the Commissioners would
  leave the pace of a Land Development application to the Applicant's discretion.  In this
  case, however, we have the unusual situation that your clients are already occupying the
  building in question in a manner which the Commissioners believe to be illegal (i.e.
  without first obtaining Land Development Approval).  As a result, the delay and repeated
  offers of extensions of time only prolong this illegal situation.  The Commissioners and
  staff have tried to be patient and cooperative, but both matters . . . have gone on long
  enough."  Id.  Plaintiffs do not identify any other properties that had a similar "unusual
  situation."

- *Plaintiffs' argument:*  Plaintiffs contend that just over four months after submission of
  plaintiffs' initial land development application, Berger wrote a memo to Commissioner
  Robert Gillies that plaintiffs might be at the end of the line with respect to extensions.
  *The evidence of record:*  Contrary to plaintiffs' characterizations, Berger did not say that
  plaintiffs were "at the end of line" for extensions.  Rather, he noted that plaintiffs had not
  sought another extension for the review period, which was set to expire in a week.  Pls.'
  Opp'n Summ. J., Ex NNN.  He went on to comment that in the event plaintiffs sought
  another extension, it would be their third "which is normally the last extension the Board
  would consider.  There is no hard and fast rule on the number of extensions to be granted
  to a potential developer, but heretofore, by providing some guidance to developers that
  the extensions are not limitless, the developers have increased their diligence in resolving
  the deficiencies."  Id.  Despite this general practice of allowing only three extensions, it is
  undisputed that plaintiffs' time for revision and review was again extended.

- *Plaintiffs' argument:*  Plaintiffs claim that they were treated differently than how the
  Township professes to treat others with respect to citations.  They claim that Lesniak
  testified that it was "always" the practice of Code Enforcement to first try and work with
  the owner to get them to comply with the code, yet plaintiffs frequently received citations
  without any opportunity to address their supposedly wrongful conduct.  Lesniak Dep. 95–
  97.

*The evidence of record:*  Plaintiffs provide no evidence that they were ever cited prior to having an opportunity to correct their alleged wrongful conduct.  Quite to the contrary, the evidence reveals that plaintiffs were routinely issued warning letters with time to remedy violations prior to receiving citations.  <u>See</u> Pls.' Opp'n Summ. J., Ex. P (Jan. 2001 letter); Defs.' Mot. Summ. J., Ex. 6 (Dec. 1, 2001 letter); Pls' Opp'n Summ. J., Ex. U (July 1, 2003 letter); Defs.' Mot. Summ. J., Ex. 29 (Nov. 24, 2003 letter); Pls.' Opp'n Summ. J., Exs. SS & TT (December 3 and 23, 2004 letters); Defs.' Mot. Summ. J., Exs. 59 & 60 (February 2009 letters).

- *Plaintiffs' argument:*  Plaintiffs claim that, unlike others, they were "purportedly" subject to "routine inspections."  They contend that there was no formal procedure for making regular inspections of the Township's commercial or industrial properties.  *The evidence of record:*  Other than one letter showing an inspection on January 24, 2001, plaintiffs produce no evidence of being subject to "routine" inspections.  Pls.' Opp'n Summ. J., Ex. JJ.  Township Officer Hamaday testified that although there was no formal procedure for making inspections, he would do so if there was a complaint, a permit or if he was driving around and saw a problem.  Pls.' Opp'n Summ. J., Ex. PPP, Hamaday Dep., 34:12–35:9.  Plaintiffs offer no proof that their property was the only one subject to such inspections.

- *Plaintiffs' argument:*  Plaintiffs claim they were treated differently because the Board of Commissioners' meeting minutes show that every other land development application voted on by the Board from 1996 to 2012 was approved, with the exception of plaintiffs' application.  Pls.' Opp'n Summ. J., Exs. QQQ, RRR.
  *The evidence of record:*  As described in detail above, plaintiffs' representative Collier admitted that plaintiffs' application was almost through the review process and would have likely earned approval until plaintiffs directed him to stop making any further revisions.  As such, when it came time for a vote, the application was denied.  Plaintiffs have not demonstrated that any other applicant acted similarly but received approval.

- *Plaintiffs' argument:*  Plaintiffs assert that a "telling sign" of disparate treatment is the number of times plaintiffs were cited by the Township for failure to secure land development approval.  Plaintiffs assert that Township Manager Berger directed Code Enforcement Officer Dunlop to "cite Giuliani every day the violation exists until the District Court tells you to stop."  Pls.' Opp'n Summ. J., Ex. LLL.  Plaintiffs claim that Dunlop could not recall ever receiving such an order from Berger for any other property.  *The evidence of record:*  Dunlop actually testified that daily citations were permissible, noting "[t]here have been actions taken in the township that's included in the township code that it's a possibility. It's stated in several code sections."  Pls.' Opp'n Summ. J., Ex. MMM; Dunlop Dep. 101:22–102:1.  Berger distinguished plaintiffs' situation by commenting, "[h]onestly, we have never had this kind of issue with a property owner totally ignoring the requests to go through land development and resolving life safety issues on the properties"  Berger Dep. 844:24–45:4.

- ***Plaintiffs' argument:***  Plaintiffs claim that they had been given until November 30, 2004 to revise their land development application to address Township concerns only to have the Board of Commissioners deny their application on November 8, 2004.
  ***The evidence of record:***  The Board previously warned plaintiffs that although they were being given until November 30, 2004 before final review, "if substantial progress with respect to the filing of satisfactorily revised land development plans and the amicable resolution of the Code Enforcement Appeal was not made by the time of the Commissioners' meetings in November, the Board would deny any further extensions of time and would render decisions on both the application and appeal based on the paperwork in the file at that time."  Defs.' Mot. Summ. J., Ex. 47. [21]

In short, plaintiffs' saturation of the record with isolated citations to the record does not meet their summary judgment burden.  Mere quantity of evidence showing some factual dispute is insufficient to deny a summary judgment motion; rather the party opposing summary judgment must show a *genuine* issue of *material* fact.  As I find that defendants' actions in this case have a clearly-established rational basis, I will grant summary judgment on the equal protection claim in defendants' favor.

## IV.  Conspiracy Claim

In count II of the complaint, plaintiffs bring a cause of action under 42 U.S.C. § 1985(3) for conspiracy to violate the Fifth and Fourteenth Amendments.  To maintain a § 1985 cause of action, a plaintiff must establish: (1) a conspiracy by the defendants; (2) that the conspiracy was designed to deprive plaintiff of the equal protection of the laws or equal privileges and immunities; (3) the commission of an overt act in furtherance of that conspiracy; (4) a resultant injury to person or property or a deprivation of any right or privilege of citizens; and (5) that defendants' actions were motivated by a racial or otherwise class-based invidiously

---

[21]      Plaintiffs also allege that, in a settlement between the Township and Cheltenham Transportation, one of plaintiffs' current tenants, relating to Cheltenham's prior use of a different property, the Township negotiated for the inclusion of a provision that obligated Cheltenham "to utilize reasonable efforts to convince [plaintiffs] that, under these circumstances, it would be appropriate for [plaintiffs] to terminate [their] currently pending litigation against the Township." Pls.' Opp'n Summ., Ex. SSS.  While this fact is certainly unusual, it does not raise the specter of any equal protection violation relating to the Township's treatment of plaintiffs' property.

discriminatory animus.  Litz v. Allentown, 896 F. Supp. 1401, 1414 (E.D. Pa. 1995).  The

element of class-based animus is essential to a proper § 1985 claim.  Robison v. Canterbury

Village, Inc., 848 F.2d 424, 430 (3d Cir. 1988); Pratt v. Thornburgh, 807 F.2d 355, 357 (3d Cir.

1986) ("As to the claim founded on 42 U.S.C. §1985(3), we need only say that it was properly

denied since it is not alleged that the conspiracy involved in that count was motivated by a racial

or class-based animus.").  The Supreme Court has clarified that commercial and economic

animus cannot form the basis for a section 1985(3) claim.  United Bhd. of Carpenters and Joiners

of Am., Local 610 v. Scott, 463 U.S. 825, 838 (1983).

Plaintiffs have not alleged that they are a member of any protected class.  Moreover, they

have not provided any response to defendants' motion for summary judgment on this claim.  As

plaintiffs have not alleged, let alone produced evidence of, any racial or class-based animus, I

will grant summary judgment in favor of defendants on this claim.[22]

## V.     State Law Claim for Tortious Interference

Count V of plaintiffs' complaint[23] alleges a state law claim for tortious interference with

actual and prospective relationships.  Specifically, plaintiffs contend that, as a result of

defendants' actions, plaintiffs have lost leases with several actual and potential tenants.  Compl.

¶ 128.  Further, plaintiffs claim to have been prevented from selling the property to potential

purchasers.  Id. ¶ 129.  Defendants now argue that, having dismissed all federal claims, I should

decline to exercise supplemental jurisdiction over this claim or, in the alternative, grant summary

---

[22]      Defendants alternatively address count II as a § 1983 conspiracy claim.  Plaintiffs'
complaint, however, expressly designates this count as being raised under 42 U.S.C. § 1985, and
plaintiffs have not indicated otherwise in their briefing.

[23]      The complaint did not contain a Count III or Count IV.

judgment on the merits.  Although I will retain jurisdiction over this claim, I hold that defendants are entitled to summary judgment.

### A.       Supplemental Jurisdiction

Under 28 U.S.C. § 1367, "a district court has authority to exercise supplemental jurisdiction over non-federal claims arising from the same case or controversy as the federal claim."  De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 307–08 (3d Cir. 2003).  "The purpose of supplemental jurisdiction is to promote convenience and efficient judicial administration."  Resnick v. Lower Burrell Police Dept., No. 09-893, 2010 WL 88816, at *3 (W.D. Pa. Jan. 8, 2010).  When the district court dismisses all of the claims over which it had original jurisdiction, it may decline to exercise supplemental jurisdiction.  28 U.S.C. § 1367(c)(3).  "A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."  Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009).  In order to determine whether supplemental state law claims should be dismissed when the federal law claims have been eliminated before trial, the court must consider the balance of factors including judicial economy, convenience, fairness, and comity.  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).

Having dismissed all of the federal claims in this matter, I now have the discretion regarding whether to exercise supplemental jurisdiction over the state law claim.  Based on the aforementioned factors, I will retain jurisdiction over these claims.  The present case was filed more than six years ago.  Discovery is complete and summary judgment motions were briefed more than one year ago, but stayed pending the outcome of the parties' ongoing settlement discussions.  Retaining the state court claim will not significantly increase any judicial burden,

whereas dismissal will result in fundamental unfairness to plaintiffs.  Therefore, I will

jurisdiction over count V under 28 U.S.C. § 1367(a).

> **B.     Merits of Tortious Interference Claim**

Alternatively, defendants seek summary judgment on the merits of the tortious

interference claim.  As set forth below, I find that plaintiffs have not produced sufficient

evidence to survive summary judgment review.

The elements of a claim for tortious interference derive from the Restatement (Second) of

Torts § 766, which has been adopted by Pennsylvania courts and federal courts applying

Pennsylvania law.  See Prudential Ins. Co. of Am. v. Stella, 994 F. Supp. 318, 322 n.1 (E.D. Pa.

1998); Walnut St. Assoc., Inc. v. Brokerage Concepts, Inc., 982 A.2d 94, 97 n.2 (Pa. Super. Ct.

2009), citing Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 393 A.2d 1175 (Pa. 1978),

aff'd, 20 A.3d 468 (Pa. 2011).  This section states:

> One who intentionally and improperly interferes with the
> performance of a contract (except a contract to marry) between
> another and a third person by inducing or otherwise causing the
> third party not to perform the contract, is subject to liability to the
> other for the pecuniary loss resulting to the other from the failure
> of the third person to perform the contract.

Restatement (Second) Torts § 766.  Give these dictates, a plaintiff alleging tortious interference

under Pennsylvania law must plead the following elements:

> (1) the existence of a contractual, or prospective contractual
> relation between the complainant and a third party; (2) purposeful
> action on the part of the defendant, specifically intended to harm
> the existing relation, or to prevent a prospective relation from
> occurring; (3) the absence of privilege or justification on the part
> of the defendant; and (4) the occasioning of actual legal damage as
> a result of the defendant's conduct.

CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc., 357 F.3d 375, 384 (3d Cir. 2004)

(quotations omitted).

"In determining whether there is a prospective contractual relationship in a tortious interference case, Pennsylvania courts have considered whether the evidence supports a finding that there was an objectively 'reasonable likelihood or probability' that the contemplated contract would have materialized absent the defendant's interference." Accumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 213 (3d Cir. 2009) (quotations omitted). "A 'reasonable likelihood' of occurrence is something less than a contractual right but more than a mere hope that there will be a future contract." Id. A plaintiff must base a claim of prospective relationship on something other than an existing or current relationship." Id.

Defendants contend that the record is devoid of evidence to support this claim and plaintiffs offer no direct response to defendants' argument. Plaintiffs' complaint, however, alleges that as a result of the defendants' wrongful actions, plaintiffs have lost leases with several actual and potential tenants, including: Leary Paving, Upper Dublin School District, Romano, Iggy's Landscape, Buckley & Co., BFI, Verizon, R&S Imports, Springfield School Board, Rail Road Construction Co. and Recycling Consortium. Compl. ¶ 128. In addition, plaintiffs were allegedly prevented from selling the property to potential purchasers including New Covenant Church. Id. ¶ 129. Plaintiffs offer references to several of these entities within the lengthy factual recitation section of their brief. The evidence of record is as follows:

Leary Paving, Iggy's Landscaping and R&S Imports: Plaintiffs allege that on November 24, 2003, they received a Notice of Property Maintenance Code violation for, in part, leasing a portion of their property to Leary Paving, E-Pak Technologies, Iggy's Landscaping and R&S Imports. Pls.' Mem. Supp. Opp'n Summ. J. 11. Plaintiffs produce no evidence as to the tenancy of these entities after November 24, 2003 or whether they left the property in light of this letter.

54

Buckley & Company:  The sole reference to Buckley in the record comes in the form of a letter from Lesniak to Buckley denying its application for a use and occupancy permit to become a tenant at the property until a land development plan had been submitted to and approved by the Board of Commissioners.  Pls.' Opp'n Summ. J., Ex. 65.  As set forth above, the Township's position regarding the need for land development approval was affirmed by the state court order of March 22, 2006.

E-Pak Technologies:  E-Pak Technologies, one of plaintiffs' former tenants, received a December 13, 2001 letter from the Township asserting that E-Pak was in violation of Township Code by storing appliances on the property.  Pls' Mem. Supp. Opp'n Summ. J. 10; Pls.' Opp'n Summ. J., Ex. T.  Plaintiffs produce no other evidence about any business relationship they had with E-Pak that was affected by the Township.

Romano's Bus Service:  Plaintiffs argue that Romano's School Bus Service terminated their lease with plaintiff because of the Township's determination that plaintiffs could not proceed with a necessary paving project without securing land development approval. Pls.' Opp'n Summ. J, Ex CC (plaintiffs' representative's letter stating that they intended to pave a portion of the stone parking lot on the property for an incoming lessee); Pls.' Opp'n Summ. J., Ex. DD (responsive letter from Township stating plaintiffs needed to submit to full land development plan in order to complete paving project because of other issues with the property). After the exchange of these letters, however, Richard Collier, plaintiffs' consulting land planner, wrote to Lesniak explaining that plaintiffs no longer wished to use the property for bus operations and, therefore, were not actively pursuing the prior application for subdivision any further.  Defs.' Mot. Summ. J., Ex. 10.  This abandonment of their application negates any

argument that the contemplated contract would have materialized but for the defendants' interference.

BFI and Verizon:  Giuliani, Jr. testified that the Township would show up at the property. He believed that this "had something to play in with BFI's decision not to take the property." Giuliani, Jr. Dep. 542:19–23.  Giuliani, Jr. testified that the problem with BFI "might have been the same case with" Verizon.  Id.at 543:18–20; 546:2–8.  No one at BFI ever told him that, nor did he even have a contact at BFI.  Id. at 542:24–43:17.

Recycling Consortium:  Plaintiffs argue that in October 2003, they received a letter from the Township that it had "come to the Township's attention" that plaintiffs were recently attempting to lease space at their site for the staging of recycling trailers.  Pls.' Opp'n Summ. J., Ex. HH.  The letter went on to note that plaintiffs had previously been informed that each new tenancy requires submission of an application for land development to the Township and that "it would be prudent" to discuss potential tenancies with the Township prior to entering a lease.  Id. Plaintiffs contend that because they were already feeling intense scrutiny from the Township, they abandoned plans to lease to the recycling center.  Pls.' Mem. Supp. Opp'n Summ. J. 15. Plaintiffs present no argument or evidence that the Township precluded them from applying for land development in order to pursue this tenant.

New Life Presbyterian Church:  Giuliani, Jr. testified that he a submitted a subdivision plan to the Township in 2000 or the sale to the church, but voluntarily withdrew that plan because "New Life wasn't getting good feelings from the township as far as having a church there."  Giuliani, Jr. Dep. 546:9–13.  Giuliani, Jr. had no personal knowledge on this issue, nor did he identify witnesses or documents to support his belief.  Id. at 547:18–24.

<u>Upper Dublin School District, Springfield School Board and Rail Road Construction</u>:
Plaintiffs produce no evidence of any tortious interference as to these entities.

It is well-established that in defending against a motion for summary judgment, a plaintiff cannot simply rely on its pleadings, but rather must counter with evidence that demonstrates a genuine issue of fact. <u>Big Apple BMW</u>, 974 F.2d at 1362–63. Plaintiffs, however, have not addressed the merits of this claim, let alone set forth specific facts supporting their position. Instead, they rely on the mere speculative belief that the Township's requirement of land development approval resulted in their loss of tenants and/or purchasers. Such unsupported assertions, conclusory allegations and mere suspicions are insufficient on summary judgment review. Moreover, the isolated pieces of evidence sprinkled throughout plaintiffs' statement of facts constitute nothing more than a "mere scintilla of evidence." Accordingly, I will grant summary judgment for defendants on this claim.

## CONCLUSION

After many years of discovery and motion practice in the present case, plaintiffs have simply neglected to adduce sufficient evidence to create a genuine issue of material fact as to any of their claims.[24] Their procedural due process claim fails in light of the adequate remedial processes in place of which plaintiffs availed themselves. Their substantive due process claim is, in part, barred by the <u>Rooker-Feldman</u> doctrine and, in part, fails to establish any behavior by defendants which can be fairly said to "shock the conscience." In their equal protection claim, plaintiffs have neither produced evidence of any similarly-situated comparators nor made a plausible showing that defendants' actions were arbitrary or irrational. Plaintiffs' § 1985 conspiracy claim fails absent some showing of class-based animus. Finally, plaintiffs' state law

---

[24]     Having dismissed all substantive claims, I need not address either defendants' qualified immunity argument or their motion for summary judgment as to punitive damages.

tortious interference claim must be dismissed given the dearth of evidence that defendants tortiously interfered in any of plaintiffs' existing or prospective business relationships.  Having already accorded plaintiffs adequate time in which to satisfy their evidentiary burdens and substantiate their claims, I will enter judgment on all claims in favor of all defendants.

An appropriate Order follows.